CITY OF ANN ARBOR v THE UNIVERSITY CELLAR, INC

Docket No. 57822. Argued June 8, 1977 (Calendar No. 15).—Decided
October 6, 1977. Rehearing granted in part 402 Mich 957.

The State Tax Commission found no exemption from City of Ann
Arbor taxes for personal property owned by The University
Cellar, Inc., a nonprofit, nonstock corporation which operates a
bookstore on the University of Michigan campus. The Court of
Appeals, McGregor, P. J., and D. E. Holbrook, Jr., and M. J.
Kelly, JJ., reversed on the ground that the fact that the
university regents set up a corporation to operate a bookstore
instead of a division within the university, should not deprive
the university of the tax exemption (Docket No. 21526). Plain-
tiff appeals. *Held:*

1. The determination of the State Tax Commission that the
defendant's property is not property of the University is af-
firmed. The relationship between the defendant's purpose and
the University's educational mission indicates that the exemp-
tion of the Cellar's stock-in-trade is consistent with the purpose
of the exemption but does not touch the question whether the
Cellar's property is, in substance, the property of the Univer-
sity. That question depends essentially on whether the Regents
of the University of Michigan or persons acting for and respon-
sible to them so dominate the management and operation of
the Cellar that its separate corporate identity should be ig-
nored. The substance of the matter is thus more a question of
fact than of law. The finding of the State Tax Commission is
supported by the evidence and, indeed, there is no evidence
that would support any other finding.

REFERENCES FOR POINTS IN HEADNOTES
[1] 71 Am Jur 2d, State and Local Taxation § 365.
[2, 5, 10] 71 Am Jur 2d, State and Local Taxation § 382.
[3, 8] 73 Am Jur 2d, Statutes §§ 274–276.
[4] 71 Am Jur 2d, State and Local Taxation § 366.
[6] 73 Am Jur 2d, Statutes §§ 145, 146.
[7, 9] 71 Am Jur 2d, State and Local Taxation §§ 326, 327.
[11] 16 Am Jur 2d, Constitutional Law § 16.
[12] 15A Am Jur 2d, Colleges and Universities § 9.
[13] 71 Am Jur 2d, State and Local Taxation § 370.

2. The Court of Appeals erred in equating the administration, faculty and students with the University and in concluding that the University of Michigan does, in fact, own and control the defendant corporation. The University sought to divorce itself from any responsibility for the results of the corporation's operations. The Regents have made it abundantly clear that they do not wish to hazard any responsibility or accountability for the success or failure of this enterprise.

3. If the Court were to pierce the corporate veil and treat the property of the Cellar as belonging to someone other than the corporate entity of the Cellar, there is more reason to characterize its property as belonging to the Student Government Council, which controls the Cellar's board of directors, than to characterize it as university property. It is significant that the University is not seeking an exemption for the Cellar. When the Cellar was established without retention of managerial control, it was effectually determined that the tax and other advantages of association with the University were outweighed by the disadvantages or that the savings resulting from such association did not justify the resulting exposure and high degree of managerial responsibility.

The decision of the Court of Appeals is reversed.

Justice Coleman, joined by Justices Williams and Blair Moody, Jr., dissented. She wrote:

1. The University of Michigan is an educational institution incorporated under the laws of this state. Its personal property is tax exempt. The question is whether the defendant corporation's personal property is "property of" the university within the meaning of the tax exemption statute.

2. In addition to the ordinary principles of statutory interpretation, when a special privilege or tax exemption is claimed under a statute, it is to be construed strictly against the property owner and in favor of the public. However, strict construction does not mean strained construction adverse to the Legislature's intent. It is only one principle of statutory construction which, together with many others, acts as a guide in the search for the Legislature's intent.

3. Tax exemptions that are based on strong public policy and that promote the public welfare are not construed as strictly as exemptions for commercial or business enterprises. Tax exemptions for educational institutions are classic examples of this rule because the purpose is to encourage and support the establishment and maintenance of these institutions. Such exemptions must be construed consonantly with the spirit which prompted the adoption of the provisions in question and

in a manner which will give them full effect. In this case, the ordinary principles of statutory interpretation lead to the conclusion that the corporation's personal property is tax exempt.

4. The University of Michigan Board of Regents is a constitutionally recognized branch of the state's government with powers equal to the Legislature's within the sphere of its authority. It could, in the exercise of its broad discretion to manage the University's affairs, establish a nonprofit bookstore on campus and delegate to it some of the Regents' own power. Instead the Board of Regents approved creation of a corporation, which exists at its pleasure to do the work for it, with an initial capital contribution from the unversity and continuing contributions by each new student. No outsiders are involved. In substance, the corporation's property is property of the University. The fact that a ´small portion of the defendant corporation's personal property is not books and school supplies does not govern the resolution of this case, nor does the fact that some goods are sold to the general public.

65 Mich App 512; 237 NW2d 535 (1975) reversed.

## OPINION OF THE COURT

1. TAXATION—PERSONAL PROPERTY—EXEMPTIONS—UNIVERSITY OF MICHIGAN—BOOKSTORE.

The question whether the personal property of a student bookstore on the University of Michigan campus is, in substance, tax-exempt university property depends essentially on whether the University Regents or persons acting for and responsible to them so dominate the management and operation of the bookstore that its separate corporate identity should be ignored; the substance of the matter is thus more a question of fact than of law (MCL 211.9; MSA 7.9).

2. TAXATION—PERSONAL PROPERTY—UNIVERSITY OF MICHIGAN—BOOKSTORE.

A student bookstore on the University of Michigan campus is not the university or controlled by the University Regents for purposes of personal property taxation, even though its board of directors is selected only by students, faculty and the University president, which are institutional bodies officially recognized by the Regents as integral parts of the university, where there is no evidence that the bookstore is required to make any report to the Regents, nor is there any evidence that the Regents or the university administration are informed about the course or results of operations or influence operations or management (MCL 211.9; MSA 7.9).

3. TAXATION—STATUTES—CONSTRUCTION—WORDS AND PHRASES.

Strict construction does not mean strained construction adverse to the Legislature's intent; in deciding whether personal property is tax-exempt within the meaning of the statute a court's duty is to ascertain and give effect to the Legislature's intent (MCL 211.9; MSA 7.9).

4. TAXATION—PERSONAL PROPERTY—CHARITABLE, EDUCATIONAL AND SCIENTIFIC INSTITUTIONS—EXEMPTIONS—EXTENSION.

The Legislature, assuming that it intended to permit a tax-exempt charitable, educational or scientific institution to extend its exemption from personal property taxes to a nonexempt organization, did not intend to permit such extension without retention of managerial and operational control of the nonexempt organization; absent such control, the property of the nonexempt organization is not the property of the exempt institution within the meaning of the personal property tax statute (MCL 211.9; MSA 7.9).

DISSENTING OPINION BY COLEMAN, J.

WILLIAMS and BLAIR MOODY, JR., JJ.

5. TAXATION—PERSONAL PROPERTY—COLLEGES AND UNIVERSITIES—EXEMPTIONS.

*The University of Michigan is an educational institution incorporated under state law whose personal property is tax exempt (MCL 211.9; MSA 7.9).*

6. STATUTES—CONSTRUCTION—LEGISLATIVE INTENT.

*The goal in any case of statutory interpretation is to ascertain and give effect to the Legislature's intent.*

7. TAXATION—STATUTES—CONSTRUCTION—SPECIAL PRIVILEGES—EXEMPTIONS.

*A special principle plays a part in construing tax exemption statutes in addition to the ordinary principles of statutory interpretation; when a special privilege or exemption is claimed under a statute, charter, or act of incorporation, it is to be construed strictly against the property owner and in favor of the public.*

8. STATUTES—CONSTRUCTION—WORDS AND PHRASES.

*Strict construction does not mean strained construction adverse to the Legislature's intent; it is only one principle of statutory construction which, together with others, acts as a guide in the search for the Legislature's intent.*

9. TAXATION—STATUTES—CONSTRUCTION—EXEMPTIONS.

Tax exemptions that are based on strong public policy and that promote the public welfare, such as for educational institutions, are not construed as strictly as exemptions for purely commercial or business enterprises; the meaning of these laws must be ascertained by a construction consonant with the spirit which prompted their adoption which will give them full effect.

10. SCHOOLS AND SCHOOL DISTRICTS—TAXATION—EXEMPTIONS—PUBLIC POLICY.

The public policy to encourage and support the establishment and maintenance of educational institutions, which is the basis for exempting their personal property from taxation, dates back to our state's very beginning (Northwest Ordinance of 1787, Art III).

11. SCHOOLS AND SCHOOL DISTRICTS—WORDS AND PHRASES—"MEANS OF EDUCATION".

Books and other school supplies are an integral part of the "means of education" within the meaning of the Northwest Ordinance of 1787, (Art III).

12. COLLEGES AND UNIVERSITIES—UNIVERSITY OF MICHIGAN—REGENTS —POWERS—BOOKSTORE.

The University of Michigan Board of Regents is a constitutionally recognized branch of the state's government with powers equal to the Legislature's within its sphere of authority; the regents could, in the exercise of that discretion, establish a nonprofit bookstore on the university campus and delegate to it some of the regents' own power.

13. TAXATION—PERSONAL PROPERTY TAX—COLLEGES AND UNIVERSITIES —UNIVERSITY OF MICHIGAN—REGENTS—EXEMPTIONS.

Personal property of a nonprofit, nonstock corporation created by the Regents of the University of Michigan to maintain and operate a bookstore on the university campus is tax exempt property where the bookstore furnishes educational supplies and a few items incidental to campus living at the lowest possible prices, the corporation exists at the pleasure of the regents, the university contributed the initial capital and each new student makes a refundable capital contribution, and no outsiders are involved in the corporation; the fact that a small portion of the corporation's personal property is not books and school supplies does not govern the resolution of the case, nor does the fact that some goods are sold to the general public (MCL 211.9; MSA 7.9).

*R. Bruce Laidlaw,* Acting City Attorney, for plaintiff.

*Forsythe, Campbell, Vandenberg, Clevenger & Bishop, P. C.* (by *Raymond F. Clevenger* and *David T. Bell)* for defendant.

Levin, J. The University Cellar, Inc., was incorporated at the direction of the Board of Regents of the University of Michigan to maintain and operate a nonprofit book store at the University.

The issue is whether the Cellar is exempt from property taxation by the City of Ann Arbor because its inventories of textbooks, other books and supplies, household appliances and sundries, fixtures and other personal property are "public property belonging to the state"[1] or are the "personal property of charitable, educational, and scientific institutions, incorporated under the laws of this state".[2]

The State Tax Commission, finding that the University "is not in control" of the Cellar, rejected the Cellar's claim that its inventories "belong to" and are the "property of" the University. The Commission reasoned that whether the University controls the Cellar depends on whether the Regents have voting control of the Cellar's board of directors and, through its board, its officers. Finding that the Regents do not control the Cellar's board and hence do not control its management, the Commission concluded that the Cellar's property is not the property of the University.

The Court of Appeals reversed; it concluded that "the University retains sufficient ownership and control" over the Cellar "so that its property can

---

[1] MCLA 211.7; MSA 7.7.

[2] MCLA 211.9; MSA 7.9.

be said, as a matter of law, to be the property of the University of Michigan".[3]

My colleague, emphasizing the relationship between the Cellar's purpose and the University's educational mission, the Regents' sponsorship of the Cellar and their power to inhibit its successful operation by withdrawing funding and other support and to terminate its corporate existence, concludes that it would not be consistent with the purpose or the policy of the exemption to deny it in this case, and that, in substance, the property of the Cellar is the property of the University.

We reverse the Court of Appeals and affirm the State Tax Commission's determination that the Cellar's property is not University property.

There is no need to reach the question implicitly decided by the Court of Appeals and in my colleague's opinion of whether a tax exempt organization may extend its exemption to a separate corporation, albeit one organized to carry out the exempt purpose. The predicate of any such extension must, as my colleague states, be that the property of the corporation not itself exempt is, in substance, the property of the exempt organization.

The relationship between the Cellar's purpose and the University's educational mission indicates that exemption of the Cellar's stock-in-trade is consistent with the purpose of the exemption but does not touch the question whether the Cellar's property is, in substance, the property of the University.

The question whether the property of the Cellar is, in substance, University property depends essentially on whether the Regents or persons acting for and responsible to them so dominate the man-

---

[3] *Ann Arbor v The University Cellar, Inc,* 65 Mich App 512, 519; 237 NW2d 535 (1975).

agement and operation of the Cellar that its separate corporate identity should be ignored. The substance of the matter is thus more a question of fact than of law.

The State Tax Commission found that the University is not in control of the Cellar. That factual determination is evidentially supported and, indeed, there is no evidence that would support any other finding.

I

The Regents authorized the incorporation of the Cellar, contributed $100,000 from the Student Vehicle Fund to its capital and imposed a mandatory, refundable $5 deposit on the students.

The Regents retained the power to terminate the Cellar's corporate existence and, upon termination, any assets remaining after the payment of liabilities reverts to the Regents. The Regents could also eliminate the $5 student deposit.

Six of the ten directors are selected by the Student Government Council, three by the Faculty Assembly, and one by the University president. It does not appear whether there are members or stockholders of the Cellar and who they may be. It therefore does not appear whether the Regents or anyone acting for them is a member or stockholder of this corporation.

Corporations are controlled by their directors and those who, under the articles of incorporation, have the right to select them.[4] The students, who select a majority of the directors, control the Cel-

[4] 2 Fletcher, Cyclopedia Corporations, § 505, pp 527–542; *Detroit & Canada Tunnel Corp v Martin,* 353 Mich 219, 233; 91 NW2d 525 (1958); *Ayres v Hadaway,* 303 Mich 589, 594; 6 NW2d 905 (1942); *Union Trust Co v Parker,* 251 Mich 630, 639; 232 NW 360 (1930).

lar's board of directors. That control is shared with three faculty members.

While the Student Government Council and Faculty Assembly are part of the overall University community, both organizations are independent of and not in any sense subservient to the Regents or to the administration of the University. It cannot be seriously contended that the student-designated directors represent the Regents.

The Court of Appeals erred in equating the "administration, faculty and students" with the "University",[5] and in "conclud[ing] that the University of Michigan does, in fact, own and control the defendant corporation".[6]

The Cellar is not the University or controlled by the Regents even though "its board is selected only by institutional bodies officially recognized by the Regents as integral parts of the University".

There is no evidence that the Cellar is required to make any report to the Regents or someone designated by them. Nor is there any evidence that the Regents or the administration are informed about the course or results of operations or influence operations or management, let alone attempt to exercise control, directly or indirectly.

The Regent's power to deny the Cellar space in University buildings, withdraw financial support and terminate its corporate existence provides no assurance that the Regents exercise any supervision or control or, indeed, that operations have been conducted in a manner consistent with the purpose for which the Cellar was organized.

The University sought to divorce itself from any responsibility for the results of operations; a stated reason for organizing a separate corporation was

---

[5] *Ann Arbor v The University Cellar, supra,* pp 520–521.

[6] *Id,* p 520.

to insulate the Regents from responsibility and the University from liability to creditors of the Cellar. The Regents have made it abundantly clear that they do not wish to hazard any responsibility or accountability for the success or failure of this enterprise.

It was the Cellar's burden to establish entitlement to exemption from taxation. Although a purpose of organizing the Cellar was to provide the students with books and supplies at a reduced cost and it was intended that the Cellar would operate on a nonprofit basis, there is no evidence whatsoever whether and to what extent these goals have in fact been achieved.

There is no record support for the Court of Appeals statement that the Cellar operates on a "break-even" basis. The Cellar offered no history of operations or financial information. It does not appear, for example, how the prices of its textbooks and supplies compare with those sold by privately operated stores. The Cellar has a substantial inventory of phonograph records, household appliances, and other articles; there is no indication of the percentage of its total dollar volume represented by sales of textbooks and supplies. Nor is there any information regarding salaries or other compensation paid to the managers and other executive employees of this enterprise or the services performed or time devoted by them to its business.

## II

We are in agreement that in deciding whether the Cellar's personal property is the property of the University within the meaning of the statute our duty is to ascertain and give effect to the Legislature's intent. As aptly stated by my colleague, "strict construction, does not mean

strained construction adverse to the Legislature's intent".[7]

Sometimes it is helpful to describe what a case is not about. This case is not about education or student welfare, but personal property taxes. The issue is not whether the Cellar is a good idea, beneficial to students and a laudable, well-operated store, or even whether it operates on a break-even basis. The issue is whether its inventories and other personal property are University property.

It has been stressed that many colleges and universities have a school-sponsored book store. It does not appear, however, whether such book stores are operated through separate corporations controlled by students without ongoing supervision by the school. Nor does it even appear whether the personal property of such book stores is exempt from property taxation and, if so, whether under a general or special exemption.

The corporation deemed to be a part of Catholic University in *District of Columbia v Catholic Education Press, Inc,* 91 US App DC 126; 199 F2d 176 (1952), was directed, controlled and managed by a board of trustees consisting of the same persons comprising the university's board of trustees. The corporation in *State ex rel Wisconsin University Building Corp v Bareis,* 257 Wis 497; 44 NW2d 259 (1950), was organized to acquire real estate for the exclusive use and benefit of the university. The court concluded that property so acquired was beneficially owned by the state and exempt from taxation. The inventory of goods in this case is not held for the exclusive benefit of the University.

---

[7] "Exemptions from taxation are not to be enlarged by implication if doubts are nicely balanced. *Chicago Theological Seminary v Illinois,* 188 US 662, 674; 23 S Ct 386; 47 L Ed 641 (1902). On the other hand, they are not to be read so grudgingly as to thwart the purpose of the lawmakers." *Trotter v Tennessee,* 290 US 354, 356; 54 S Ct 138; 78 L Ed 358 (1933).

The association operating a book store in *Stanford University Book Store v Helvering,* 65 US App DC 364; 83 F2d 710 (1936), was denied tax-exempt status. There, officers and directors of the association were selected from its membership, which was restricted to faculty members.

The instant case is also distinguishable from *Ann Arbor v State Tax Commission,* 393 Mich 52; 223 NW2d 1 (1974), where the issue was whether properties of the University of Michigan Union, University of Michigan Lawyers Club and the Board In Control of Intercollegiate Athletics were tax-exempt. Records in the office of the Register of Deeds showed the land and buildings used by the Union, the Lawyers Club and the Board In Control were owned by the Regents.

## III

One can acknowledge the desirability, or even urgency, of establishing a university-sponsored book store without agreeing that the inventories and other personal property of the Cellar are tax-exempt.

The University had a choice in the creation of this book store. It might have been established as a University project with a high degree of student involvement but with retention by the Regents, either through dominance of a separate operating corporation or otherwise, of a substantial measure of managerial control over operations and with a corresponding exposure to persons who deal with the book store—suppliers for unpaid bills and customers for injuries on the premises and product liability.

The original proposals considered by the Regents would have established the book store on that

basis, but it was finally decided to separate the University from operations both to satisfy student insistence on a high degree of control tantamount to total control[8] and to reassure Regents who were concerned that the University might otherwise be subject to liability.

It is significant that the University is not seeking an exemption for the Cellar. Its counsel declined to enter an appearance or participate in these proceedings although invited to do so by the State Tax Commission. One can understand that the Regents would be reluctant to increase the University's exposure by arguing in effect that the Cellar is the alter ego of the University when a precondition to the Cellar's establishment was that the University not have any exposure beyond the contributed capital.

If the inventories of unsold goods which Ann Arbor seeks to tax are the property of the University, then the University must perforce be responsible for defective goods. It was, at least in part, to avoid such responsibility that the University established a separate corporation and divorced itself from ongoing responsibility for the management and financial affairs of this enterprise.

To disregard the corporate entity and treat the Cellar as the alter ego of the University for tax exemption purposes, and yet regard it as a separate entity for purposes of determining whether the University is subject to liability to unpaid suppliers or to customers who are injured on the

---

[8] The original proposals provided for retention by the Regents of substantial control of operations but the students insisted on student control. At the time the Regents faced massive student discontent reflected in various forms of civil disobedience.

It is clear that the issue of control was resolved in favor of the students and that it was not intended that the Regents would have any effective control over the management of the Cellar.

premises or by defective products would be to run with the hare and hunt with the hounds.          ·

When the Cellar was established without retention of managerial control, it was effectually determined that the tax and other advantages of association with the University were outweighed by the disadvantages or that the savings resulting from such association did not justify the resulting exposure and high degree of managerial responsibility.

A decision to hazard the tax disadvantages is entirely understandable in light of the relatively small amount of taxes[9] in comparison to the supervisory costs and tension between administration and students that might result if the University had insisted on a different form of organization.

## IV

My colleague's opinion refers to *Webb Academy v Grand Rapids,* 209 Mich 523, 540–541; 177 NW 290 (1920), where the following language[10] is quoted approvingly:

" 'In providing for these exemptions, the object was to foster educational institutions by relieving their property, within prescribed limits, from the burden of taxation.' "

Denying tax exemption in this case will not

---

[9] A textbook retailing for $10 may cost the book store $7. Assuming a relatively low turn-over of 3-1/2 times a year and assessment at 50% as required by the constitution, the assessment on a book selling at $10 would be $1. If the tax rate is 50 mills, the tax would be 5 cents, or 1/2 of 1% of the sales price. This means that if a student spends $50 a year at the Cellar on textbooks he would, unless the Cellar can absorb the tax through sales of other articles, contribute 25 cents to the cost of local government.

[10] *Bishop & Chapter of the Cathedral of St John the Evangelist v Arapahoe County Treasurer,* 29 Colo 143, 145–146; 68 P 272 (1901).

burden either the University or the taxpayers of this state; neither will be assessed, directly or indirectly, to pay the personal property taxes assessed against the Cellar's inventory and other personal property. Nor will it unduly burden the Cellar. It may reduce any surplus from operations or result in a small increase in the cost of books, supplies and other articles sold at the Cellar, thereby burdening students, faculty and members of the general public who patronize the Cellar.

It is entirely true that if the University itself were to go into the book and school supply business its inventories would be exempt. The Regents have, however, exercised restraint in utilizing their exemption.[11]

If we may pierce the corporate veil and treat the property of the Cellar as belonging to someone other than the corporate entity of the Cellar, there is more reason to characterize its property as belonging to the Student Government Council, which controls the Cellar's board, than to characterize it as University property.

We conclude, assuming, again, that the Legislature intended to permit an exempt organization to extend its exemption to a nonexempt organization,

---

[11] A decision approving exemption in this case could engender proposals for the creation of other student-controlled enterprises under the umbrella of the University's tax exemption.

Students have many needs besides textbooks, supplies, phonograph records, cosmetics, appliances and other artifacts of the kind sold at the Cellar. Housing, food, shelter, transportation, even recreation, are necessary and related to the educational process. One can visualize that enterprising students might seek to establish other student-controlled organizations for the purpose of supplying fast food, clothing, recreation and housing on a "break-even", "nonprofit" basis. Surely the Legislature did not intend that such enterprises would obtain tax exemptions merely because the University sets in motion the organization and assists in the initial financing, and retains the power to terminate and, on termination, to recover any assets remaining after payment of the liabilities without regard to whether the University retains any meaningful managerial control and supervision of the enterprise.

that it did not intend to permit such extension without retention of managerial and operational control of the nonexempt organization, and that absent such control, the property of the nonexempt organization is not the property of the exempt organization within the meaning of the statutory exemption for personal property belonging to the state and for personal property belonging to incorporated charitable, educational and scientific institutions.

We reverse the Court of Appeals and remand the cause to the State Tax Tribunal for consideration of the issue of valuation as of December 31, 1970 and December 31, 1971 according to evidence presented by the parties.

KAVANAGH, C. J., and FITZGERALD and RYAN, JJ., concurred with LEVIN, J.

COLEMAN, J. The University Cellar, Inc., is a nonprofit, nonstock Michigan corporation created to operate and maintain a bookstore on the University of Michigan campus. The City of Ann Arbor seeks to tax the Cellar's personal property. The question is whether this property is tax-exempt property of the University of Michigan. The State Tax Commission said no.[1] The Court of Appeals unanimously reversed.[2] We would affirm the Court of Appeals.

I

In 1969 the University of Michigan was one of the few institutions of higher education in this state without a nonprofit bookstore on campus. This deficiency prompted the University's Student Government Council and Faculty Assembly to submit a proposal for such a bookstore to the Board of Regents.

---

[1] *In re Petition No 9-118 of the University Cellar, Inc* (1974).

[2] 65 Mich App 512; 237 NW2d 535 (1975).

In the past, the Regents had rejected similar proposals.[3] One reason why the Board of Regents opposed a bookstore was that it would have special advantages, such as freedom from taxation, that privately owned bookstores in Ann Arbor did not enjoy.[4]

When the Regents initially considered the Student Government Council-Faculty Assembly proposal, they adhered to their past decisions and rejected it.[5] However, after intense lobbying by the students and faculty, the Regents changed their minds and approved the general concept of a bookstore.[6]

After many discussions with the students, faculty and administration, the Regents decided that the most acceptable vehicle by which to implement the approved concept was to create a nonprofit, nonstock Michigan corporation to operate and maintain the bookstore.[7] Similar corporations already were being used successfully by the University to operate the school's student publications program and its intercollegiate athletic program. Therefore, in March of 1970, the Regents formally approved articles of incorporation for "The Board for the Student Bookstore, Inc." In April the articles were filed with the Secretary of State and the corporation came into existence. Later, the name was changed to "The University Cellar, Inc."

During the discussions leading to the Regents' approval of the articles of incorporation, the subject of tax exemptions was thoroughly explored.

[3] University of Michigan, Proceedings of the Board of Regents, 1926–1929, p 1016; 1929–1932, p 270; 1957–1960, p 1122.

[4] *Ibid.*

[5] University of Michigan, Proceedings of the Board of Regents, July 18, 1969–June 16, 1972 (hereafter Regents' Minutes), July 1969, p 23.

[6] Regents' Minutes, September 1969, pp 97–102; October 1969, pp 203–204.

[7] Regents' Minutes, October 1969, pp 203–204; March 1970, pp 388–390.

The Regents and the President of the University expressed a goal of obtaining tax exemptions for the corporation so that it would be economically viable and so that it could achieve its purpose of providing books and supplies at reasonable prices.[8] Before the articles were approved, the President engaged the noted tax expert Professor L. Hart Wright of the University of Michigan Law School to prepare memoranda of law that resulted in state and Federal tax exemptions for the corporation.

When the corporation came into existence it had no assets.[9] The original capital funds came when the Regents transferred $100,000 of University money to the corporation.[10] The Regents also provided for the additional funds necessary to the continuing operation and maintenance of the corporation by ordering each new incoming student to contribute $5 to the corporation.[11] This contribution is mandatory. It is collected at the beginning of each semester by the University and then transferred to the corporation. If a student does not pay the contribution, the University places a "hold credit" notation on the student's records. Until the student pays, no academic credit is given by the University for courses completed by the student. When the student leaves the University, he or she may recover the $5 by filing a formal request. If no request is filed within one year of the student's departure, the money cannot be recovered. It becomes a permanent asset of the corporation.

After extensive negotiations between the students, faculty, administration and Regents, it was

---

[8] Regents' Minutes, October 1969, pp 203–205.

[9] Articles of Incorporation, art V.

[10] Regents' Minutes, March 1970, p 389.

[11] Regents' Minutes, May 1970, p 458.

decided that a ten-member board of directors would be established to oversee the general operation of the corporation. The power to select the board's members was delegated to the officially recognized representatives of the University's three major constituencies: the Student Government Council was given the power to select six members; the Faculty Assembly would select three; and the President, representing the administration, would select one.[12] The board, in turn, would select a manager to direct the corporation's daily operations.

The Regents announced that the corporation should be operated on a break-even basis. Prices were to be set as low as possible consistent with this operating policy in order to achieve the corporation's purpose, which, as stated in Article II of the articles of incorporation, is

"to maintain and operate at the University of Michigan a store to sell books and supplies to bona fide students, faculty and employees in order to promote the educational and economic welfare of students, faculty and employees of the University of Michigan".

The Regents retained the absolute power to completely withdraw their authority to operate the bookstore from the corporation. They also have the power to cut off or reduce the corporation's principal source of working capital by re-evaluating their previous order requiring each incoming student to contribute $5 to the corporation.

The bookstore is located in the basement of the University of Michigan Student Union. The Union, which is also a nonprofit, nonstock Michigan corporation, leases the space to the University Cellar,

[12] Bylaws, art I.

Inc. The lease prohibits the bookstore from selling tobacco and candy products, decorated clothing or souvenir items bearing the University of Michigan insignia and certain newspapers and magazines. The lease provides for periodic rental of the Union Ballroom in order to accommodate the bookstore's need for extra space during the fall and winter semester "book rush".

The bookstore is open to the students, faculty and staff of the University and to the general public. In addition to the books and supplies ordinarily associated with a school bookstore, it sells the supplies and materials required by the art, photography and music students at the University. Some magazines and cosmetics are also sold. Services that are especially in demand by students, such as Xerox photocopying and the rental of small appliances for dormitory rooms, also are provided.

The bulk of the corporation's personal property is the bookstore's inventory of saleable goods. The remainder is equipment such as cash registers and copying machines.

If the Regents withdraw their authority to operate the bookstore from the corporation, or if the corporation otherwise ceases to exist, the net assets of the corporation revert to the Regents.[13] This includes any personal property remaining after liabilities have been paid. To the extent that the net assets total less than the amount of outstanding $5 student contributions, the students lose that money. After the students have been paid, to the extent that the remaining net assets total less than the University's $100,000 initial capital outlay, the University loses this money.

---

[13] Articles of Incorporation, art IX.

## II

The two basic tax exemption statutes in this state are MCLA 211.7; MSA 7.7 and MCLA 211.9; MSA 7.9. The city wants to tax the Cellar's personal property. MCLA 211.7; MSA 7.7 governs exemption of real property and is not at issue here. MCLA 211.9; MSA 7.9 governs exemption of personal property and is the focus of our attention. It says, *inter alia:*

"The following personal property shall be exempt from taxation:

"(a) The personal property of * * * educational * * * institutions, incorporated under the laws of this state."

The University of Michigan is an educational institution incorporated under the laws of this state. Its personal property is tax exempt. The question is whether the corporation's personal property is "property of" the University within the meaning of the exemption statute.

Our goal, as in any other case of statutory interpretation, is to ascertain and give effect to the Legislature's intent. *Frost-Pack Distributing Co v Grand Rapids,* 399 Mich 664; 252 NW2d 747 (1977); *Evanston YMCA Camp v State Tax Commission,* 369 Mich 1; 118 NW2d 818 (1962); *Detroit Home & Day School v Detroit,* 76 Mich 521; 43 NW 593 (1889).

In addition to the ordinary principles of statutory interpretation which act as guides in this search, a special principle plays a part in cases involving tax exemption statutes. It is stated in former Chief Justice COOLEY's treatise on taxation as follows:

"[W]hen a special privilege or exemption is claimed

under a statute, charter or act of incorporation, it is to be construed strictly against the property owner and in favor of the public.[14]

Although this principle is important, care must be taken not to misapply it. It is not a litany that rotely determines the outcome of every case involving a claimed tax exemption. Strict construction does not mean strained construction adverse to the Legislature's intent. It is only one principle of statutory construction which, together with many others, acts as a guide in the search for the Legislature's intent. *Webb Academy v Grand Rapids,* 209 Mich 523; 177 NW 290 (1920); *Detroit Home & Day School v Detroit, supra.* Justice Cooley viewed the principle in its proper perspective when in his treatise, he said:

"When it is said that exemptions must be strictly construed in favor of the taxing power, this does not mean that if there is a possibility of a doubt it is to be at once resolved against the exemption. It simply means that if, after the application of all rules of interpretation for the purpose of ascertaining the intention of the legislature, a well founded doubt exists, then an ambiguity occurs which may be settled by the rule of strict construction. The rule of strict construction does not relieve the court of the duty of interpreting the exemption by the ordinary rules of construction in order to carry out the intention of the legislature * * * . A fair and reasonable construction of the statute or contract must always be adopted, giving the language used its ordinary meaning, and taking into consideration the purpose and spirit of the exemption as well as the public policy entertained at the time * * * when the statute was passed."[15]

---

[14] 2 Cooley on Taxation (4th ed), § 672, p 1404.

[15] 2 Cooley on Taxation, *supra,* § 674, pp 1415–1417.

The United States Supreme Court said it even more bluntly:

"Its proper office is to help solve ambiguities, not to compel an immediate surrender to them—to be an element in decision, and effective, maybe, when all other tests of meaning have been employed."[16]

The principle of strict construction should guide us, not blind us, when we search for the Legislature's intent.

One other aspect of the principle of strict construction must be noted in this case. Even when it is proper to apply the principle, it is not always to be applied with equal force. Tax exemptions that are based on strong public policy and that promote the public welfare are not construed as strictly as exemptions for purely commercial or business enterprises. *Webb Academy v Grand Rapids, supra; Detroit Home & Day School v Detroit, supra.* Tax exemptions for educational institutions are classic examples of this rule. *Ibid.* The unanimous *Webb* Court outlined how the principle of strict construction should be applied in cases involving statutes exempting educational institutions from taxation. Quoting from *Bishop & Chapter of the Cathedral of St John the Evangelist v Arapahoe County Treasurer,* 29 Colo 143, 145–146; 68 P 272 (1901), the Court said:

"In providing for these exemptions, the object was to foster educational institutions by relieving their property, within prescribed limits, from the burden of taxation. This being the end to be attained, the meaning of the law must be ascertained by a construction within its spirit, purpose and policy not opposed to its letter. In

---

[16] *Citizens' Bank v Parker,* 192 US 73, 86; 24 S Ct 181; 48 L Ed 346 (1904).

brief—a construction consonant with the spirit which prompted the adoption of the provisions in question, and which will give them full effect."[17]

## III

The purpose of that part of MCLA 211.9; MSA 7.9 which exempts the personal property of educational institutions from taxation is to encourage and support the establishment and maintenance of these institutions and to promote the pursuit of knowledge by the people of this state. The policy on which such exemptions are based dates back to our state's very beginning. The Northwest Ordinance of 1787 says:

"Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." Art III.

Books and other school supplies are an integral part of the "means of education".

The Board of Regents of the University of Michigan is a constitutionally recognized branch of the state's government with powers equal to the Legislature's within the sphere of its authority. *Board of Regents of the University of Michigan v Auditor General,* 167 Mich 444; 132 NW 1037 (1911). It has broad discretion to manage the University's affairs. It could, in the exercise of that discretion, establish a nonprofit bookstore on campus and delegate to it some of the Regents' own power. If they chose to operate the bookstore themselves and to hold the legal title to the store's personal property in their own names, there is no doubt that the property would be tax exempt "property

---

[17] *Webb Academy v Grand Rapids, supra,* 540–541.

of" the University within the meaning of MCLA 211.9; MSA 7.9.

The bookstore approved by the Regents is situated on University property for the purpose of furnishing educational supplies and a few items incidental to campus living at the lowest possible prices. Instead of operating the bookstore themselves, the Regents have approved the creation of a nonprofit, nonstock Michigan corporation to do the work for them. The corporation exists at the pleasure of the Regents. They can withdraw their authority to operate the bookstore from the corporation at any time and for any reason. They can also cut off or reduce the corporation's principal source of working capital. The corporation's personal property reverts to the Regents if they withdraw their authority to operate the bookstore or if the corporation is otherwise dissolved. The members of the corporate board of directors, by approval of the Regents, are selected by the three major University constituencies.

For us to rule that the corporation's personal property is not property of the University or that the operation of the bookstore is not consistent with the purpose and policy of the exemption statute would exalt form over substance.

Without the Regents' approval, the corporation would not have come into existence. Without the University's $100,000 initial capital contribution and the continuing contribution of $5 by each new student, the corporation would not have been able to purchase the personal property which the corporation holds at the pleasure of the Regents and which the city now seeks to tax. The Regents can reacquire this property whenever they wish by simply withdrawing their authority to operate the bookstore from the corporation. Until this occurs,

the Regents have entrusted the property to the representatives of groups which are part of and officially recognized by the University. No outsiders are involved. In substance, the corporation's property is property of the University. And it is substance, not form, that controls the resolution of cases such as this. *Knapp-Stiles, Inc v Department of Revenue,* 370 Mich 629; 122 NW2d 642 (1963); *Engineering Society of Detroit v Detroit,* 308 Mich 539; 14 NW2d 79 (1944). The corporation's personal property is tax exempt under MCLA 211.9; MSA 7.9.

This interpretation of the exemption statute is in harmony with the statute's spirit, purpose and policy and not in conflict with its words.

The fact that a small portion of the corporation's personal property is not books and school supplies per se (although it encompasses student needs) does not govern the resolution of this case. Nor does the fact that some goods are sold to the general public. MCLA 211.9; MSA 7.9 exempts all of the personal property of an educational institution and does not require that each item be used solely, strictly and exclusively for educational purposes at the University. In addition, incidental characteristics or uses of property are not controlling. Primary characteristics and uses prevail. *Webb Academy v Grand Rapids, supra.*

IV

In this case, the ordinary principles of statutory interpretation lead to the conclusion that the corporation's personal property is tax exempt. Therefore, Justice COOLEY's "special principle" of strict construction does not apply.

Former Justice CAMPBELL wrote an appropriate

closing for this opinion in the *Detroit Home & Day School* case nearly 100 years ago. He said:

"Exemption from taxation is the only form of encouragement that our laws provide. * * * The advantage of multiplying the facilities of learning has been rightly regarded as worth to any decent community very much more than can be counted in money.

* * *

The language of the Legislature in exempting from taxation is as much entitled to obedience as that imposing taxation."[18]

The Court of Appeals should be affirmed. No costs, a public question.

WILLIAMS and BLAIR MOODY, JR., JJ., concurred with COLEMAN, J.

[18] *Detroit Home & Day School v Detroit, supra,* 524–525.