CPC INTERNATIONAL, INC., Plaintiff,

v.

AEROJET–GENERAL CORPORATION, Cordova Chemical Company, Cordova Chemical Company of Michigan, and Michigan Department of Natural Resources, Defendants.

UNITED STATES of America, Plaintiff,

v.

CORDOVA CHEMICAL COMPANY OF MICHIGAN, Cordova Chemical Company of California, Aerojet–General Corporation, CPC International, Inc., and Dr. Arnold C. Ott, Defendants.

CPC INTERNATIONAL, INC., Third-party Plaintiff,

v.

COMMERCIAL UNION INSURANCE COMPANY, et al., Third-party Defendants.

Nos. G89–10503 CA, G89–961 CA.

United States District Court, W.D. Michigan, S.D.

Aug. 27, 1991.

---

13. *Id.* at para. 9.

552

Patrick J. Conlon, Roseland, N.J., J. Michael Smith, Gordon J. Quist, Miller, Johnson, Snell & Cummiskey, Grand Rapids, Mich., Randy M. Mott, Raissa Kirk, Robert T. Lee, Stephen E. Williams, Mott, Williams & Lee, PC, Washington, D.C., William S. Wells, CPC Intern., Inc., Englewood Cliffs, N.J., for CPC Intern. Inc.

John D. Tully, Warner, Norcross & Judd, Grand Rapids, Mich., for Aerojet–General Corp., Cordova Chemical Co. and Cordova Chemical Co. of Mich.

Thomas J. Gezon, Michael L. Shiparski, Asst. U.S. Attys., Grand Rapids, Mich., Michael J. McNulty, Gregory L. Sukys, and Thomas Carroll, U.S. Dept. of Justice, Environmental Enforcement Section, Environment and Natural Resources Div., Washington, D.C., Nicholas Bollo, and Larry L. Johnson, Associate Regional Counsel, U.S. EPA, Region V, Chicago, Ill., for U.S.

Stewart H. Freeman, Kathleen L. Cavanaugh and Eric J. Eggan, Asst. Attys. Gen., Frank J. Kelley, Atty. Gen., Environmental Protection Div., Lansing, Mich., for Michigan Dept. of Natural Resources.

HILLMAN, Senior District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .................................................... 554
II. FINDINGS OF FACT................................................ 555
 A. Background ................................................. 555
 1. Ownership .............................................. 555
 2. Contamination ......................................... 555
 3. EPA's response ........................................ 556
 4. Stipulations .......................................... 556

 B. Ownership by Ott I: 1957 to 1965 ............................ 557

 C. Ownership by Ott II: 1965 to 1972 ........................... 557
 1. Acquisition of Ott I .................................. 557
 2. Board of directors .................................... 558
 3. Management ............................................ 559
 4. CPC's development company ............................. 560
 5. Environmental matters................................. 561
 6. Financial matters ..................................... 562
 7. Labor matters ......................................... 562
 8. Other business matters ................................ 562
 9. Sale of Ott II to Story ............................... 562

 D. Ownership by Story: 1972 to 1977 ............................ 562

 E. Agreement between MDNR and Cordova/California: 1977 ......... 562
 1. MDNR's environmental emergency ........................ 562
 2. Negotiations between MDNR and Aerojet's Cordova Chemical Co. 563
 3. The stipulation and consent order ..................... 564
 F. Ownership by Cordova/California and Cordova/Michigan: Since 1977 .. 567
 1. Acquisition of the site ............................... 567
 2. Incorporation of Cordova/California, Cordova/Michigan .. 568
 3. Aerojet's direct involvement with the site ............ 568
 4. Integration of business ............................... 568
 5. Board of directors .................................... 569
 6. Management ............................................ 569
 7. Financial matters ..................................... 570
III. CONCLUSIONS OF LAW............................................. 570
 A. CERCLA overview ............................................ 570
 B. Conclusions of law regarding CPC liability ................. 571
 1. Claims against CPC .................................... 571
 2. Section 107(a)(2) "operator" liability ................ 571
 a. Parent corporation liability under section 107(a)(2) ... 571
 b. Liability of CPC under section 107(a)(2) .............. 574
 C. Conclusions of law regarding MDNR liability ................ 576
 1. Claims against MDNR ................................... 576
 2. Section 107(a)(3) "arranger" liability ................ 576
 3. Section 107(a)(2) "operator" liability ................ 577
 D. Conclusions of law regarding liability of Aerojet, Cordova/California, 578
 Cordova/Michigan
 1. Claims against Aerojet and its subsidiaries ........... 578

**554**

2. Section 107(a)(1) "present owner" liability........................ 578
3. Section 107(a)(2) "operator" liability ............................. 579
4. Section 107(a)(3) "arranger" liability ............................. 580
5. Section 107(b)(3) innocent landowner defense..................... 580

IV. CONCLUSION............................................................. 581

## I. INTRODUCTION

This consolidated action involves a series of claims brought under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* (1988). The parties are litigating who must pay past and future costs incurred in the environmental cleanup of the soil, surface water and groundwater surrounding a dormant chemical manufacturing plant that has become one of the nation's most severely contaminated areas.

Following denial of summary judgment on liability issues,[1] the CERCLA liability phase of this case was tried before the court over 15 days in May and June 1991. This opinion sets forth the court's findings of fact and conclusions of law regarding CERCLA liability.

The parties participating in the liability phase were the United States; CPC International, Inc. ("CPC"); the Michigan Department of Natural Resources ("MDNR");

and Aerojet–General Corporation ("Aerojet"), along with its two wholly owned subsidiaries, Cordova Chemical Company and Cordova Chemical Company of Michigan (collectively, "the Cordova defendants").[2]

CPC, MDNR and the Cordova defendants each defended theories of liability advanced by the United States or other defendants under CERCLA's liability provisions in section 107(a) of the statute.[3] 42 U.S.C. § 9607(a). The court heard live testimony from 29 witnesses, received all or part of dozens of depositions, and admitted more than 2,300 trial exhibits. Following the trial, each party submitted proposed findings of fact and conclusions of law. On June 28, 1991, the parties delivered closing arguments.

 After careful consideration of all the evidence and arguments set forth, the court makes the following findings of fact and conclusions of law on the issues of CERCLA liability, in accordance with Fed. R.Civ.P. 52(a).[4]

---

1. By prior order of the court, this case has been separated into three phases: liability, remedy and insurance coverage. *See* Order, November 14, 1990. The court denied nine dispositive motions filed with respect to liability. *See* Bench Opinion, February 4, 1991 & *CPC Int'l, Inc. v. Aerojet–General Corp.,* 759 F.Supp. 1269 (W.D.Mich.1991).

2. The parties announced on the morning of trial that claims had been settled against another party, Arnold Ott. The court is currently awaiting presentation of a consent decree in accordance with CERCLA's settlement provisions, 42 U.S.C. § 9622 *et seq.*

3. On April 30, 1991, the state filed a motion to dismiss based on eleventh amendment immunity all state-law claims brought against it by Aerojet, Cordova/California and Cordova/Michigan. On May 24, 1991, the court granted the motion in an opinion and order dismissing without prejudice claims for breach of contract, promissory estoppel, negligent misrepresentation and specific performance. *CPC,*

*International, Inc. v. Aerojet–General Corp.,* 764 F.Supp. 479, 482 (W.D.Mich.1991).

4. CERCLA liability, when it attaches is joint and several unless a defendant proves that the harm is divisible. *United States v. Northeastern Pharmaceutical & Chem. Co.,* 579 F.Supp. 823 (W.D.Mo.1984), *aff'd in part and rev'd in part on other grounds,* 810 F.2d 726 (8th Cir.1986); *United States v. Ottati & Goss, Inc.,* 630 F.Supp. 1361 (D.N.H.1985). However, under a provision of CERCLA added by Congress in 1986, a potentially liable party may seek contribution from any other potentially liable party for a share of the response costs. 42 U.S.C. § 9613(f)(1). In allocating response costs in a contribution action, a court has broad discretion to use equitable factors as it deems appropriate. *United States v. R.W. Meyer, Inc.,* 932 F.2d 568 (6th Cir.1991).

In this case, the parties have advanced contribution claims against each other, seeking to reduce the amount of any liability that may attach. As previously indicated to the parties, the court is electing to defer until after the remedy phase findings of fact and conclusions

## II. FINDINGS OF FACT

### A. Background

#### 1. Ownership

The site of contamination that is the subject of this litigation is located at 500 Agard Road in Dalton Township, Michigan, ("the site"), near Muskegon in a primarily rural area in the western part of the state. Groundwater underneath the site flows through an aquifer in a southeasterly direction toward two waterways, Little Bear Creek and the Unnamed Tributary.

From approximately 1959 to 1986, the site was used by a series of owners as a chemical manufacturing facility for the production of a variety of synthetic organic intermediate chemicals used for pharmaceutical, veterinary and agricultural purposes.

From 1957 to 1965, the site was owned and operated by the Ott Chemical Company, a Michigan corporation ("Ott I").

From 1965 to 1972, the site was owned and operated by a wholly owned subsidiary of CPC International, Inc. ("CPC")[5], known as Ott Chemical Company ("Ott II").

In 1972, Ott II sold the site to Story Chemical Company ("Story"), a Georgia corporation. Story owned and operated the site until it was adjudicated bankrupt in 1977.

In 1977, the Michigan Department of Natural Resources ("MDNR") initiated a regulatory investigation at the site aimed at determining the extent of environmental problems and possible remedies. As part of its efforts, MDNR tried to attract a new purchaser for the site who would participate in a cleanup of the site. As a result of these efforts MDNR entered into negotiations with Aerojet–General Corporation and its subsidiary, Cordova Chemical Company. These negotiations were fruitful and on October 13, 1977, Cordova Chemical Company ("Cordova/California") signed a "stipulation and consent order" with MDNR that set forth obligations with respect to efforts to remedy environmental contamination problems at the site. One day later, Cordova/California, a wholly owned subsidiary of Aerojet–General Corporation ("Aerojet"), purchased the site from the Story bankruptcy trustee.

In 1978, Cordova Chemical Co. of Michigan ("Cordova/Michigan"), a wholly owned subsidiary of Cordova/California, became the owner of the site. Cordova/Michigan continues to own the site, but the facility has not been in operation since 1986.

#### 2. Contamination

Prior to the commencement of chemical manufacturing at the site in 1957, the quality of the groundwater underneath the site was excellent.

By 1959, as a result of chemical waste disposal, the water pumped for use in the manufacturing process at the site had become contaminated. By 1964, test results showed that the groundwater flowing underneath the site had become contaminated.

As a result of chemical manufacturing and waste disposal practices at the chemical facility, the soil, surface water and

---

of law with respect to allocation of liability. After the remedy phase, the court will have heard evidence regarding the extent of the harm caused by hazardous waste disposal as well as the cost of the remedy. At that time, the court will be able to reach an equitable decision regarding how cleanup costs should be allocated among liable parties.

Deferring allocation decisions until after the remedy phase is consistent with the legislative history of section 113(f)(1). The House Committee that drafted the provision stated, *"[A]fter all questions of liability and remedy have been resolved,* courts may consider any criteria relevant to determining whether there should be apportionment."* H.R. 253(III), 99th Cong., 2d Sess. 19, (1985), *reprinted in* 1986 U.S.Code Cong. & Admin.News 3038, 3041–42 (emphasis added). *See also Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 667–68 (5th Cir.1989) (favoring resolution of liability issues "before deciding the more complicated and technical questions of appropriate cleanup measures and the proportionate fault of liable parties").

**5.** After the events at issue in this case, Corn Products Company changed its name to CPC International, Inc. For simplicity, "CPC" will be used in all of the court's references to the company.

groundwater at the site contain a large number of toxic chemicals.

The principal source of contamination at the site was the use of engineered, unlined lagoons at the northwestern edge of the site for chemical waste disposal. From 1959 to at least 1968, during the Ott I and Ott II periods of ownership, wastewaters and other chemical waste used in the manufacturing process were discharged into the lagoons, where much of the contaminants seeped into the ground and water. No disposal into the lagoons occurred during the Story and Cordova periods.

During the Ott I and Ott II era, chemical waste also entered the ground through the burial and slitting of hundreds of drums in a sandy pit; numerous spills of hundreds of gallons of chemicals from train cars onto railroad tracks; frequent overflows of chemical waste at a cement-lined equalization basin; and the dumping into the woods of buckets of hazardous chemicals that had spilled during the manufacturing process. Some spills of hazardous waste also occurred during the Story and Cordova periods of ownership.

Contamination entering the ground from disposal in the lagoons or through spills then seeped into the ground and migrated away from the site via the aquifer to the southeast, ultimately reaching two waterways, Little Bear Creek and the Unnamed Tributary.

Beginning in 1965 during the Ott I period of ownership and continuing during the Ott II period, purge wells were used intermittently at the site in an attempt to treat the groundwater contamination and retard the spread of contamination away from the site.

However, after 1974 during the Story era of ownership and continuing through periods of ownership by Cordova/California and Cordova/Michigan, the purge wells were not operated for any significant time period, resulting in the continued, unchecked spread of contamination away from the site through groundwater.

During their period of operations, Cordova/Michigan and Cordova/California neither buried waste nor dumped it onto the ground. No chemical waste was disposed into the unlined lagoons that had been used during the Ott I and Ott II eras. Before beginning chemical manufacturing, Cordova/Michigan repaired the equalization basin and chemical sewer system. When operating, Cordova/Michigan discharged chemical waste through off-site disposal or to a sewer that flowed to the Muskegon County treatment facility.

However, two hazardous chemicals used in small amounts by Cordova/Michigan— benzene and 1,2 dichloroethane—are in the soil and groundwater at the site.

### 3. EPA's response

In 1981, the federal Environmental Protection Agency (EPA) began investigating how to remedy severe contamination problems in the ground and water at the site and surrounding area resulting from hazardous waste disposal practices at the site.

In 1982, the EPA placed the site and surrounding area on the federal government's National Priorities List of locations in need of a long-term remedial response. It is ranked 137th among this country's environmentally hazardous sites most in need of federal remedial action.

The EPA is presently continuing development of a three-phase, multi-million dollar remedial plan for the soil, surface water and groundwater at and surrounding the site.

This litigation consists of a series of consolidated claims regarding who should be liable for cleanup costs under CERCLA, 42 U.S.C. §§ 9607, 9613 *et seq.*

### 4. Stipulations

The parties have stipulated that the site is a "facility"; that the site contains "hazardous substances"; that "releases" have occurred and threaten to continue, as defined under CERCLA's relevant provisions; and that CPC, MDNR, Aerojet, Cordova/California and Cordova/Michigan are "persons", as defined under CERCLA's relevant provisions, 42 U.S.C. § 9601.

*B. Ownership by Ott I: 1957 to 1965*

From 1957 to 1965, Ott I, a publicly traded Michigan corporation, owned and operated the site as a chemical manufacturing plant.

The company was steered by an active board of directors that was significantly involved in the management of the company. Ott I's board of directors made company decisions regarding policies, goals and directions in regular meetings which were commemorated in detailed minutes. During these meetings, the board conducted working sessions in which company officers presented comprehensive reports on the performance and activities of the various divisions.

Arnold Ott was the leading officer and director of Ott I. From the inception of Ott I in 1956 through its sale in 1965 to CPC, he served as president and chief executive officer of Ott I, and at various times served in other positions, including treasurer. He also served on the company's board of directors, which he chaired for a period of time. In addition, he was the company's largest shareholder, owning nearly 30 percent of its stock in July 1965, a time when the next largest shareholder owned only about 5 percent.

Another leading Ott I official was James Eiszner, a vice-president of marketing.

In 1963, Alexander McFarlane, CPC's chairman of the board, joined the Ott–I board. He soon became impressed by members of Ott I's management group, whom he admired for their dynamic, entrepreneurial spirit. McFarlane became interested in the possibility of tapping the scientific talent he had encountered to help CPC expand its primary business areas of corn wet-milling and consumer food products.

In the spring of 1965, McFarlane and Arnold Ott began to discuss the possibility of CPC acquiring Ott I. McFarlane was interested in bringing Ott I officials, particularly Ott and Eiszner, into the CPC management structure.

As a result of the discussions, McFarlane stepped down from the board of Ott I, and negotiations between top officials of Ott I and CPC followed in April and May 1965.

*C. Ownership by Ott II: 1965 to 1972*

1. Acquisition of Ott I

In June 1965, the Ott I board approved in principle an agreement and plan of reorganization for the purchase of the company by CPC.

The same month, Arnold Ott moved to New York and assumed responsibilities within CPC management. Ott initially worked with Harold Hellman, CPC's assistant to the chairman. Ott also continued to function as president, chief executive officer, and director of Ott I. Ott's move took place three months before the formal purchase of Ott I.

In September 1965, in preparation for closing on the sale, CPC created the Four Lakes Chemical Company, a wholly owned subsidiary incorporated in Delaware and capitalized with $1,000, for purposes of acquiring Ott I. The initial directors of Four Lakes were Arnold Ott and three CPC employees.

On September 22, 1965, the Four Lakes board of directs elected as its officers five people, including Ott and Eiszner, who had held identical positions with Ott I. The board also voted to change its name, effective October 1, 1965, from Four Lakes to the Ott Chemical Company ("Ott II")

Then on September 29, 1965, Ott I's assets and certain liabilities were sold to CPC's subsidiary Four Lakes, in exchange for 75,300 shares of CPC common stock.

Under the agreement, Four Lakes agreed to assume some specific liabilities of Ott I, with Ott I continuing to be responsible for those not designated. Ott I expressly remained liable for "injury or damages to persons or property arising out of the sale of any goods, the provision of any services, or the conduct of" Ott I prior to closing. In addition, the agreement set forth that Ott I "expressly represents that it will pay, or make provision for the payment of, all liabilities and obligations of, or claims against Seller [Ott I] not expressly assumed" by CPC or Four Lakes.

The acquisition by CPC was publicized to customers, creditors, suppliers and the public.

After the sale, Ott I maintained public liability insurance for three years, but it ceased to operate as a functioning corporation. The company's name was changed to Muskegon Chemical Company.

On October 1, 1965, two days after the formal sale of Ott I, Four Lakes officially became the Ott Chemical Company ("Ott II").

Following the acquisition, Ott II functioned in a number of ways as Ott I had prior to the sale. The officers of Ott II remained identical to the officers of Ott I until March 1966. Ott II continued to use the name, "Ott Chemical Company." Ott II continued to manufacture substantially the same products. Ott II continued to sell products to nearly all of Ott I's customers. Ott II continued to employ most of the same personnel as Ott I. And Ott II continued the same chemical manufacturing operation at the same facility.

CPC nevertheless planned rapid growth for Ott II. Prior to the sale, Arnold Ott reported to the Ott I board that McFarlane and CPC president Howard C. Harder "envisage the chemical operation to reach at least $100,000,000 in five years." Following the acquisition, Ott II's production capacity significantly increased as CPC contributed millions of dollars to expansion efforts. This increase in production, in turn, created substantially greater amounts of wastewater and chemical waste in need of disposal in the unlined lagoons, which were expanded to accommodate the additional waste.

2. Board of directors

Following its acquisition of Ott II, CPC actively participated in, and at times controlled, the policy-making decisions of its subsidiary through its representation on the Ott II board of directors.

The Ott II board of directors was an active board during CPC's period of ownership, continuing the tradition established in the Ott I era of functioning in an engaged, participatory manner. The board established policies and goals for the company. It also regularly received reports and presentations from Ott II officers, including accounts of mounting problems with waste disposal. These sessions sometimes lasted three to five hours. Far more than a rubber stamp for management, the Ott II board functioned as a major source of power and decision-making at the company.

CPC had majority control of the board for nearly three years. In the first six months following the acquisition, all four directors on the then four-member board were CPC officials, including Ott. Then, from March 1970 until the sale of the company to Story in June 1972, six of the eleven board members of Ott II were individuals with CPC positions. No fewer than three CPC-affiliated directors served on the Ott II board at all times, and CPC, as 100–percent shareholder, controlled the selection of board members.

CPC directors serving on the Ott board reported back to CPC about Ott programs and gave approval on behalf of CPC for appropriation requests.

During CPC's entire period of ownership of Ott II, the chairman of the Ott II board was always a top-ranking CPC executive. The president of CPC had the authority to determine who served as Ott II's chairman. Arnold Ott served as chairman from 1966 to 1969 at the same time that he was a CPC vice-president and the president of CPC's development company. From 1969–1970, Eiszner was the Ott II chairman in addition to serving as a CPC vice-president. Finally, Beverly Warner served as chairman from 1970 to 1972 while also serving as president of CPC's development company.

Other CPC officials served as particularly influential members of the Ott II board. Within six months of the acquisition, CPC placed Harold Hellman, a CPC vice-president and assistant to CPC's president, on the board. James W. McKee, CPC's financial officer, served on the board from 1968 to 1969.

When the Ott II board expanded from eight to eleven members in 1970, the three additional directors were senior CPC em-

ployees, including Warner who was elected chairman and chief executive officer.

CPC executives who were not Ott II board members also occasionally attended Ott II board meetings, including CPC's president and its chairman of the board.

CPC matters were discussed at board meetings, and Ott II board members recognized the need to consider CPC's interest and seek strong guidance from the parent company during these sessions.

The site of the Ott II board meetings regularly alternated between Ott II's headquarters in Muskegon and CPC's headquarters in New York and later Englewood Cliffs, New Jersey.

### 3. Management

CPC also actively participated in and exerted control over day-to-day decision-making at Ott II through representation in the highest levels of the subsidiary's management.

Although Ott II corporate officers set the day-to-day operating policies for the company without any need to obtain formal approval from CPC, CPC actively participated in this decision-making because high-ranking CPC officers served in Ott II management positions. In addition, the president of Ott II reported directly to CPC's president.

The Ott II management formulated and implemented the company's day-to-day operating policies, including sales, marketing, advertising, the purchase of raw materials, research and development, hiring and personnel policies, capital expenditures, manufacturing, and environmental matters.

Several individuals served simultaneously as top-ranking Ott II and CPC officials. In some instances, the officials with dual roles at Ott II and CPC worked out of CPC's headquarters in New York.

Arnold Ott was one of the principal CPC officials who exerted control within Ott II management. Following his move to CPC headquarters to assume new corporate responsibilities at CPC even prior to the formal acquisition of Ott I, Ott served as president and chief executive officer of Ott

II through December 1966. During this period, Ott worked from CPC's headquarters where he served concurrently as a CPC vice-president responsible for scientific research. In 1968, Ott became the first president of CPC's development company, a division with oversight responsibility for Ott II and other wholly owned subsidiaries involved in scientific development. During his tenure as president of CPC's development company, Ott also served as Ott II's chief executive officer.

James Eiszner similarly held a major position at CPC at the same time that he was an active and influential member of Ott II's management. Eiszner served as Ott II's president from 1967 to 1970, and in 1968, he became a vice president of CPC's development company, reporting directly to its president, Arnold Ott. Eiszner subsequently ascended through the ranks of CPC, where he eventually became chief executive officer.

In another instance, a high-ranking CPC official became an Ott II senior officer. Beverly Warner, who became president of the development company in 1969, assumed the position of Ott II's chief executive officer in 1970, a position he retained until the sale of Ott II to Story in 1972.

CPC officials thus played decisive roles in Ott II's policy-making structure. As top officers at Ott II, these CPC officials exerted significant control and bore ultimate responsibility over decision-making at the subsidiary in areas including waste disposal, sales, marketing, manufacturing, purchasing and personnel.

The direct involvement and influence of CPC officials in Ott II decision-making at times created controversy and strains within the subsidiary.

While serving as CPC's development company president and Ott II's chief executive officer, Beverly Warner controlled decisions including production, pricing and plant operations at Ott II actually undermined a number of Ott II programs. According to Eiszner, who eventually became CPC's chief executive officer, Warner "made some terrible, terrible management

decisions which were probably what led" to the sale of Ott II in 1972.

Eiszner himself was the subject of criticism for improperly giving too much attention to CPC matters while serving in dual management roles at Ott II and CPC. At an Ott II board meeting, board members admonished Eiszner for improperly allocating too much management time to CPC.

The Ott II company airplane also was frequently unavailable for use by Ott II executives because CPC officials were occupying it for travel between their headquarters and the subsidiary.

Arnold Ott's control over Ott II matters continued even after he relinquished the Ott II presidency and served as CPC's development company president and Ott II chairman. For example, Ott singlehandedly made the decision to move Gerald Roberts, Ott II's controller and treasurer since 1967, to a similar position with the CPC's development company in 1968. Ott also personally selected Roberts' successor at Ott II, David Hackney.

4. CPC's development company

CPC's development company also actively participated in and exerted control over policy-making at Ott II in efforts to enhance performance, shape decisions and affect personnel changes.

The development company, which had oversight responsibility for a number of CPC subsidiaries with scientific or technical specialties, served as another source of policy-making for Ott II. Prior to the closing of sale of Ott II to Story in 1972, Ott II president William T. White described to Story Chemical official Harry Forman: "Ott has been operating as part of the CPC Development Company, and, in addition, Ott has had its own Board of Directors. Thus ... overall policy has come from two sources...."

Arnold Ott and Beverly Warner served successively as president of the development company during the Ott II era, and each held positions as chief executive officer and chairman of Ott II during their respective tenures with the development company. James Eiszner served as vice-president of the development company.

The development company regularly reviewed Ott II and recommended changes on matters ranging from finances to personnel, exerting pressure to generate more profits and enhance performance. The company sought to ensure that Ott II met profit plans and policy goals. It also decided, among other things, who would represent CPC on Ott II's board of directors.

Ott II submitted monthly financial reports to the development company and an annual financial prospectus known as the "green book" for review and approval. Top Ott II officers reported to development company officials as well as the Ott II board.

In addition, the development company conducted reviews of the subsidiary's performance that would be followed by calls for change within the subsidiary. For example, in December 1970, Arnold Ott and James Eiszner, who no longer held posts with Ott II, visited the subsidiary at Warner's request. In a December 21, 1970, memo to Warner summarizing the visit, Ott wrote, "No intent was made to be demeaning or critical, but rather to evoke constructive discussion on policy interpretation, goal definition, organization for achieving and means for directing and controlling the profit-generating process." The memo also stated that Ott and Eiszner had "admonished" the Ott II officers "to be more incisive and decisive, more frugal on authorizations of expenditures and to let all the personnel know—now—that the Company is off course and the team must win." After another review of Ott II, Arnold Ott took the unusual step of reporting the results to Warner in the form of a telegram sent to his home. It read, in part: "Am absolutely convinced that total financial capability [at Ott II] is grossly lacking. Sound fiscal management impossible. At present don't see plan to make profitable operations for first quarter of '71. Suggest replacing Hackney immediately as one element of remedy." David Hackney was subsequently replaced.

Other CPC officials engaged in similar missions to Ott II in which Ott II officials received instructions and directives on how to improve and change. Development company vice-president Kenneth W. Knief visited Ott II to discuss with Ott officials the accuracy of the subsidiary's profit plans shortly before CPC's sale of Ott II to Story. In a March 27, 1972, memo, following the visit, Knief wrote to Warner that Ott II management "had been advised *not* to implement any changes in activity without discussion with Englewood Cliffs," CPC's headquarters.

In sum, CPC engaged in active participation in and significant control over Ott II policy matters and decision-making both internally through representation within Ott II's management and board and externally through the supervision of CPC's development company.

### 5. Environmental matters

Along with its overall participation in Ott II policies through extensive involvement in Ott II's board and management and through active oversight by the development company, CPC actively participated in Ott II environmental matters.

Discussions of waste disposal problems and potential solutions was a major topic of discussion within the Ott II management structure and board that CPC at times dominated and controlled.

In addition, CPC became directly involved in environmental and regulatory matters through the work of G.R.D. Williams, CPC's governmental and environmental affairs director. Williams coordinated all pollution activities for CPC and its divisions and subsidiaries and became heavily involved in environmental issues at Ott II.

At the suggestion of Ott board member and CPC executive Harold Hellman, Williams became involved with Ott II in 1966 when Ott II was considering waste disposal alternatives to be discussed at an upcoming meeting with the state Water Resources Commission. Hellman recommended involving Williams because he handled all CPC pollution problems and had dealt with similar waste disposal issues at another CPC subsidiary.

CPC's Williams then actively participated in and exerted control over a variety of Ott II environmental matters

In the meeting with the Water Resources Commission, Williams participated in discussions, which, as a result of his influence, did not include presentation by Ott II of plans for a biological waste treatment facility. Williams did not feel that Ott II should mention the option because he did not think it would be needed as a waste disposal alternative.

CPC's Williams also instructed Ott II officials to limit cooperation with state and federal regulators regarding waste disposal and to consult with CPC before responding to regulatory questionnaires or other inquiries. In a memo to a new Ott II vice-president for manufacturing in 1967, Ott II president Eiszner wrote that Williams "feels that delaying tactics are almost always advisable." In a 1968 memo to top-ranking Ott II officials, Williams instructed that any unannounced visit by regulators "should be stalled for advice from N.Y." and that "[a]ny questionnaires should be filled in promptly in pencil and forwarded to Air & Water Programs for review and decision on reply." In a 1969 memo to an Ott II project engineer regarding an upcoming visit by a state regulator, Williams wrote, "As you know, it is our posture to be cooperative on the occasion of such inspections. We answer questions that are not self-incriminating, but we do not volunteer information, particularly about planned capital expenditures, production rates, sales volume and the like." In a 1971 memo regarding an upcoming federal survey to be completed by Ott II plant chemists, Williams instructed that if test results "meet acceptable levels, then the survey should be completed and forwarded by the plant manager. If they do not for any reason meet such levels, then this office should be queried with the details before the survey request is answered."

Other CPC officials also actively participated in Ott II waste disposal matters.

For example, in 1970, Hanes Heller, a CPC attorney, negotiated with the state regarding Ott II's use of a county wastewater treatment system. Heller provided detailed instructions to Ott II regarding the objectives in these negotiations and indicated that CPC approval of any agreement was necessary.

#### 6. Financial matters

CPC also exerted significant control over Ott II's finances.

Ott II prepared monthly financial reports for CPC's development company, and each year the subsidiary submitted a detailed financial plan known as the "green book" for review and approval by the parent company.

CPC functioned as Ott II's banker, advancing the subsidiary more than $5 million from 1965 to 1971. CPC also assumed a number of loans for Ott II. Ott II's funds were commingled with CPC's in a joint account.

In addition, Ott II had a limit on capital expenditures that were permitted without approval from CPC's board of directors or development company. The ceiling on capital spending that did not require parent approval was initially $5,000 in 1965 and became $200,000 in 1968.

#### 7. Labor matters

CPC officials also actively participated in some Ott II labor matters.

In 1967, CPC officials became involved in the negotiations between Ott II and a union that had previously attempted to organize at other CPC facilities.

CPC also participated in subsequent labor negotiations in 1968 and 1970.

#### 8. Other business matters

CPC also participated in other aspects of Ott II's business. CPC provided staff services and employee benefit programs to Ott II; filed patents; developed, in a cooperative effort between Ott II and another CPC research facility, chemicals for use by CPC; and coordinated outside and accounting services. CPC provided these services without charge to Ott II.

#### 9. Sale of Ott II to Story

On June 9, 1972, CPC sold Ott II to Story for approximately $6.6 million in cash and a $4 million note. The transaction was made without the knowledge of the Ott II board. For six months prior to the closing, CPC operated the Ott II business for Story. Following the sale to Story, Ott II changed its name back to Four Lakes Chemical Company.

### D. Ownership by Story: 1972 to 1977

On June 9, 1972, Story began its chemical manufacturing operations at the site.

By 1974, beset by financial problems, Story abandoned regular use of the purge well system installed during the Ott II era to eliminate contaminants from the groundwater. This abandonment increased the spread of contamination migrating away from the site.

In July 1976, Story filed for bankruptcy organization, and in August 1977, the company was adjudicated bankrupt.

The bankruptcy trustee responsible for the disposition of Story's assets, Maurice Edelman, assumed title on the site and attempted to find a buyer.

### E. Agreement between MDNR and Cordova/California: 1977

#### 1. MDNR's environmental emergency

Following Story's bankruptcy in 1977, officials with the State of Michigan began to assess the severe environmental problems presented by the abandonment of the site.

Acting in their regulatory capacity, MDNR officials, together with members of the Governor's office, Public Health Department, and State Police, visited the site and discovered the extreme severity of its environmental problems.

The site's environmental problems were legion. The toll exacted by decades of hazardous waste contamination was abundantly clear. Groundwater pumped to the surface contained foam and a brownish col-

or like root beer. The stench of chemicals permeated the air. Soil excavation revealed the taint of toxic pollution, showing purplish colors. Hundreds of chemical drums, many piled atop each other, lay around the site, randomly strewn among trees, across pavement and into sandy pits. Many of the drums and barrels were crushed, corroded and leaking, with their contents seeping into the ground. Chemical waste by-products, including thousands of broken bottles, littered the land.

Among the chemicals found at the site were potentially deadly toxics. Tanks of explosive phosgene gas, potentially deadly if released into the air, presented a serious risk to neighboring residents in the event of vandalism or an accident. Other chemicals known as probable human carcinogens were found scattered around the site, including benzene, phenol, methylene chloride, and methyl isocyanate.

Based on these discoveries, MDNR identified five severe environmental problems at the site. The five problems were prioritized in their order of immediate danger to public health: 1) the potentially explosive phosgene gas contained in large tanks at the site; 2) a contaminated water supply in the community surrounding the site; 3) contaminated sludges at the site; 4) contaminated waste containers at the site, particularly barrels and laboratory bottles; and 5) contaminated groundwater flowing underneath the site.

Although the environmental problems at the site did not qualify as a public health emergency under state fire or public health department standards, these dire environmental conditions presented an environmental emergency for MDNR. All of these severe environmental problems were going unattended and threatened to worsen, including the spread of some of the worst groundwater contamination state regulators have encountered to date. As a result, the site posed an environmental emergency in need of prompt regulatory attention from MDNR as the state agency responsible for the protection and conservation of Michigan's natural resources.

MDNR's ability to initiate an immediate cleanup of the environmental emergency at the site was severely limited, however. In 1977, Michigan and the United States had not yet established laws creating revolving funds to provide resources to pay for agency cleanups and liability provisions to seek reimbursement from polluters, such as CERCLA and its Michigan counterpart, "Act 307", M.C.L.A. § 299.601 *et seq.* Instead, in order to initiate cleanup of an environmentally contaminated site, MDNR needed to obtain a specific legislative appropriation for that purpose. The tools for government cleanups in Michigan were few, and the process for obtaining them was laborious.

In light of the severity of the environmental problems at the site and the unavailability of immediate resources to pay for a cleanup, MDNR, together with other state officials, initiated in early 1977 an effort to expedite legislation appropriating funds for cleanup of the site.

At the same time, MDNR became actively involved in efforts to attract a buyer for the site. The agency was interested in involving a new purchaser in the cleanup as a way of reducing the amount of state money that would be allocated by the legislature for its regulatory response.

2. Negotiations between MDNR and Aerojet's Cordova Chemical Co.

In March 1977, officials from Aerojet and its unincorporated division known as Cordova Chemical Company met with MDNR officials in Michigan to discuss possible purchase of the site. After the meeting, Aerojet elected not to acquire the property, due, in part, to its contamination problems.

Several months later, however, Aerojet had renewed interest in the site. Aerojet was looking for a facility to make ethelenimine ("EI"), a chemical used by its Cordova division in the manufacturing process. Aerojet had recently learned that EI would soon not be available from its previous supplier. As a result, talks between officials from MDNR and Aerojet resumed.

Discussion of the existence and spread of contamination at the site was central to the

negotiations between MDNR and Aerojet. MDNR had initially aimed to have its regulatory cleanup of the five environmental problems funded entirely by the site's new purchaser. In contrast, Aerojet was initially reluctant to pay for the cleanup of any contamination created by prior owners of the site.

The negotiations over the contamination focused on identifying aspects of MDNR's regulatory cleanup efforts at the site that the company would agree to finance. MDNR decided that receiving private funding for some of its cleanup efforts would be acceptable, and Aerojet determined that it would be willing to pay for some cleanup of the preexisting contamination at the site in exchange for promises with respect to future cleanup obligations.

With negotiations progressing, Aerojet signed a stipulation with Story's bankruptcy trustee on September 12, 1977, in which Aerojet agreed to pay for security and safety measures at the site for the succeeding two weeks in exchange for the right to match any offers to purchase the site during the time period. On September 29, 1977, Aerojet signed a similar agreement for two additional weeks.

On October 3, 1977, in anticipation of an imminent agreement to purchase the site, Aerojet incorporated its Cordova division. Cordova Chemical Company ("Cordova/California") became a wholly owned subsidiary of Aerojet, incorporated in California.

After Cordova/California's incorporation, negotiations over the purchase of the site between MDNR and Cordova/California culminated.

3. The stipulation and consent order

On October 13, 1977, a document entitled "stipulation and consent order" was signed by MDNR, Michigan's attorney general's office and Cordova/California. It addressed the problem of environmental contamination at the property and set forth obligations with respect to cleanup activities. The document was not a formal stipulation and consent order that received court approval or settled pending litigation.

One day later, Cordova/California formally purchased Story's assets, including the site, from the bankruptcy trustee for $50,000 and the assumption of certain debts, subject "to all liens, claims and encumbrances" on an "as is," "where is" basis. In total, Cordova/California paid about $2.5 million for the site, which had been appraised by the State of Michigan as being worth approximately $7.5 million.

The four-page stipulation and consent order set forth the entire agreement between MDNR and Cordova/California with respect to the contamination at the site and obligations between the parties for cleanup. It contained eight stipulated facts and nine terms and conditions.

The stipulated facts in the document recited the five pollution problems identified by MDNR in its initial assessment of the environmental emergency left after the Story bankruptcy, although they were not enumerated as such: groundwater contamination; buried waste sludge; toxic waste drums and containers; water supply problems caused by contaminated residential wells; and phosgene gas.

With respect to the groundwater problem, the stipulated facts stated that:

... Groundwater beneath and surrounding Story Chemical Corporation for an unknown distance has been and is continuing to be contaminated with toxic chemical wastes which originated at the Story Chemical Corporation facility....

... Toxic chemical wastes in the groundwater from Story Chemical Corporation are moving away from the property of the Corporation and may thereby also contaminate nearby surface waters of the State of Michigan.

... There is continued leaching of toxic chemical wastes to the groundwaters of the State of Michigan as a result of the improperly disposed waste sludges buried on the site of Story Chemical Corporation.

Stipulation ¶¶ 1, 3 5.

The stipulated facts also set forth "the most reasonable methods of abating the present pollution problems" at the site:

a) Disposal of the approximately 8,700 fifty-five gallon drums of solid and liquid chemical waste by the Department of Natural Resources by means of recovery, incineration or landfilling,

b) Excavation, removal and disposal of approximately 8,000 cubic yards of solid chemical waste, sludges and contaminated soils by the Department of Natural Resources, and

c) Neutralization, or sale, removal and disposal of the phosgene by Cordova Chemical Company.

Stipulation, ¶ 8. The "most reasonable methods of abating the present pollution problems" did not mention or address the groundwater or water supply problems.

The latter half of the document was entitled "consent order", and it set forth terms and conditions agreed to by MDNR and Cordova/California. Under the consent order, MDNR agreed to remedy the waste container and sludge problems, and Cordova/California agreed to eliminate the phosgene gas and give MDNR $600,000 to defray the costs of the agency's cleanup of the waste containers, sludge and residential wells.

MDNR expressly agreed, at its sole cost and expense, to "completely remove the approximately 8700 fifty-five gallon drums from the Story Chemical Corporation facility and dispose of such drums and their contents...." Consent order, ¶ 2. MDNR also expressly agreed, at its sole cost and expense, to "completely excavate and remove the approximately 8000 cubic yards of solid chemical wastes, sludges and contaminated soils.... [and] replace the excavated materials with clean fill." Consent order, ¶ 3.

Cordova/California expressly agreed, at its sole cost and expense, to "neutralize and dispose and/or sell and remove all phosgene presently stored on the Story Chemical Corporation property...." Consent order, ¶ 4.

Cordova/California also agreed to pay $600,000 to MDNR "to abate the pollution problems at the Story Chemical property...." Consent order, ¶ 5. The order set forth a schedule for the payments and made them contingent upon MDNR obtaining legislative and gubernatorial approval.

With respect to Cordova/California's $600,000 payment and the company's responsibility or liability for the contamination at the site it was acquiring, the consent order stated:

6. It is anticipated that said $600,000 will be sufficient to reimburse the Department of Natural Resources fully for all costs and expenses incurred by it in connection with its obligations hereunder and, in addition, to provide at least $100,-000 towards the provision of an alternative water supply system to serve residents and commercial establishments whose water supply wells are or may become affected by the groundwater contaminants emanating from the Story Chemical Corporation property. The Cordova Chemical Company shall not have any liability in the event that said $600,000 is not in fact sufficient for the intended purposes nor shall it have any responsibility whatsoever in connection with the provision of any water supply system or potable water pending availability of an acceptable water supply system to said residents and commercial establishments.

Cordova Chemical Company shall not have any responsibility or liability in connection with any other corrective actions which the Department of Natural Resources or any other governmental agency may hereafter deem necessary or advisable in connection with the contamination emanating from the Story Chemical Corporation property, including, without limitation, the creation, maintenance and operation of any purge wells.

....

8. Compliance with this Consent Order shall constitute full satisfaction of all relief, civil or administrative, which might have been, or which otherwise might be obtained against Cordova Chemical Company for any contamination of groundwater or other pollution, injury, or damage, to the environment or otherwise, caused by acts or omissions of Story Chemical Corporation facilities,

which acts, omissions or operations occurred prior to the effective date of this Consent Order, whether the contamination, pollution, injury or damage occurs prior to or after the effective date hereof.

9. By entering this Order the Department of Natural Resources agrees to indemnify and hold Cordova Chemical Company Harmless from any and all losses, damages, injury, costs and expenses (including reasonable attorney's fees) incurred or sustained by Cordova Chemical Company on account of or in connection with the Department's excavation, removal and disposal operations pursuant to paragraphs 2 and 3 of this Consent Order. This provision does not apply to losses, damages, injuries, costs and expenses caused by the willful or negligent acts of Cordova Chemical Company's employees or agents.

Consent order, ¶¶ 6, 8, 9.

In sum, as a result of the negotiations that resulted in the terms and conditions of the stipulation and consent order, MDNR secured assistance and financing from Cordova/California in its regulatory effort to remedy the severe environmental problems at the site. Specifically, Cordova/California agreed to remedy the phosgene problem itself and provide $600,000 to pay for or subsidize MDNR's removal of 8,700 drums, the excavation and removal of 8,000 cubic yards of contaminated soils, and effort to remedy the water supply problem.

However, the agreement did not provide for a total cleanup of the site's severe environmental problems. Some aspects of MDNR's ongoing regulatory efforts at the site were not covered by the terms and conditions of the agreement.

In particular, MDNR and Cordova/California did not reach an agreement regarding a remedy for the groundwater contamination problem. Instead, the fate of the groundwater problems was not resolved, with MDNR left to tackle the problem as part of its overall regulatory responsibility for the site.

In addition, the stipulation and consent order did not provide for removal of all of the site's contaminated sludge. MDNR had determined that the actual quantity of contaminated soil was 71,000 cubic yards, although the stipulation and consent order only proved for removal of 8,000 yards.

Thus, the cleanup responsibilities set forth in the stipulation and consent order were not sufficient to effectuate a total cleanup at the site. The piecemeal nature of the cleanup agreements caused some consternation among MDNR staff. But agency officials had determined that it was desirable to reach an agreement that would secure some assistance and financial support from the site's new owner as the MDNR began its initial regulatory activities.

After the signing of the stipulation and consent order, MDNR obtained a legislative appropriation to pay for the cleanup. On February 6, 1978, Michigan's Governor William Milliken signed a bill appropriating $1.27 million in funds for MDNR's cleanup of the site.

The appropriation consisted of $670,000 of state money and $600,000 paid to MDNR by Cordova/California under the consent order. The bill allocated $500,000 for "barrel and sludge removal", $600,000 for "alternative water supply" and $170,000 for "new ground water purging system."

Although the bill did not allocate money for a total cleanup, the appropriation contained funding for MDNR regulatory cleanup activities at the site that were not part of the agency's express obligations under the stipulation and consent order. Specifically, the allocation of $170,000 for groundwater purging was not related to any obligations set forth in the stipulation and consent order. Instead, the $170,000 allocation for the purging system funded MDNR's own regulatory effort to begin the cleanup of groundwater contamination. The $170,000 was requested by MDNR to pay for the design, installation and first-year of operation of a purge well system.

Several legislative and gubernatorial aides who became involved in passage of the appropriations bill did not understand that MDNR was requesting funding for

regulatory activities at the site that were outside of the obligations made under the stipulation and consent order. The aides had not participated in the negotiations between MDNR and Cordova/California. They also did not understand that the appropriations would not effectuate a total cleanup of the site. This lack of knowledge about the cleanup led to the drafting of three documents that contained erroneous information: a letter drafted for Governor Milliken stating that the $1.27 million bill would pay for a "total cleanup" and two legislative fiscal analyses that implied that the stipulation and consent order obligated MDNR to install a groundwater purging system by MDNR. Trial exhibits 1028, 1027, 1059.

Following passage of the bill, Cordova/California and MDNR fulfilled their cleanup obligations under the stipulation and consent order. Cordova/California neutralized and removed the phosgene gas at the site. MDNR, with private contractors, removed 8,000 cubic yards of sludge and 8,700 drums of waste.

During its cleanup activities, MDNR discovered additional drums that had been buried by previous owners and not previously identified by the state in its investigation. One of the drums exploded during excavation work. MDNR did not have funds appropriated to pay for this additional cleanup. As a result, the drums were reburied as a precautionary measure until funding for their removal could be obtained.

MDNR's attempts to address the groundwater contamination problem continued. In an April 3, 1978, "special program directive", an MDNR official, designated as a "highest" priority the task of "removal of contaminated groundwater and installation of public water supply" at the site.

MDNR subsequently commissioned studies in an attempt to determine the most effective plan for eliminating contaminated groundwater. The studies aimed to analyze the extent of the problem and the flow of groundwater in order to place purge wells in locations that would most effectively control and recapture spreading con-

tamination. Based on the studies, MDNR determined that an effective groundwater purging system might cost $37.7 million.

In its efforts to determine the most effective way to implement a purge system, the state expended the $170,000 it had been allocated for the new purging system. As a result, MDNR was not able to initiate any actual purging operations with the appropriations.

Following MDNR's and Cordova/California's fulfillment of their cleanup obligations under the stipulation and consent order, contamination remained at the site. Groundwater contamination continued to migrate. Thousands of yards of contaminated sludge remained in the ground and continued to leech. The recently discovered barrels also remained.

## F. Ownership by Cordova/California and Cordova/Michigan: Since 1977

### 1. Acquisition of the site

Aerojet was actively involved in Cordova/California's acquisition of the site.

A team of Aerojet officials led the initial negotiations with MDNR in March 1977. One Aerojet individual was the company's director of risk management, and another was the vice president of operations for the Cordova division.

When negotiations resumed after the Cordova division learned it would be losing its principal supplier of ethelenimine, it was Aerojet officials again who became involved. Aerojet officials and employees conducted economic, environmental, and engineering studies regarding the site to determine its compatibility with the Cordova division. Aerojet's chief negotiators were its Cordova division's controller and vice president of operations.

In addition to signing two consecutive stipulations with the bankruptcy trustee giving the company the right of first refusal to purchase the site for a two-week period, Aerojet officials drafted an initial stipulation and consent order that it presented to MDNR shortly before the incorporation of Cordova/California.

### 2. Incorporation of Cordova/California, Cordova/Michigan

At two significant junctures in the history of ownership of the site, Aerojet incorporated a wholly owned subsidiary to take title of the property.

Aerojet incorporated its Cordova division as Cordova/California in October 1977, just before acquisition of the site. Then, shortly before the commencement of its chemical manufacturing at the site, Aerojet incorporated Cordova/Michigan as a wholly owned subsidiary of Cordova/California.

On October 3, 1977, just eleven days before the formal purchase of the site, Aerojet incorporated its Cordova division as a wholly owned subsidiary, Cordova/California. Cordova/California was capitalized by Aerojet with $10,000 in common stock and $7.1 million in addition paid-in capital. As a result, a subsidiary of Aerojet, rather than Aerojet itself, purchased the site.

Despite the change in form, the company officials participating in the acquisition remained the same during the final stages of negotiation. Richard Swanson, Marshall Howes, and T.J. Glad, formerly the negotiators on behalf of Aerojet's Cordova division, represented Cordova/California. This sudden change in corporate form resulted in some confusion within the company. Swanson, who signed the consent order on behalf of "Cordova Chemical Company", did not know whether he signed the document on behalf of the Cordova division or Cordova/California.

After its incorporation and acquisition of the site in October 1977, Cordova/California began a major construction project to convert the facilities into a manufacturing plant for EI, the chemical which Aerojet's Cordova division had received from an outside supplier.

Then, on November 2, 1978, with construction complete and manufacturing operations about to begin, Cordova/California created its own wholly owned subsidiary, Cordova Chemical Company of Michigan ("Cordova/Michigan"), and transferred ownership of the site to Cordova/Michigan. Cordova/Michigan was capitalized by Cordova/California with $250,000 in common stock and $2.8 million in additional paid-in capital.

As a result, a subsidiary of Aerojet's subsidiary, rather than Aerojet's subsidiary itself, owned the site at the time that chemical manufacturing commenced.

### 3. Aerojet's direct involvement with the site

After the incorporation of each of its two subsidiaries for operations of the site, Aerojet continued to participate directly in decision-making regarding use of the facility.

In 1978, Aerojet closely supervised the construction of additional facilities at the site that were necessary for the conversion to a manufacturing plant for ethelenimine.

From 1979 until at least 1984, Aerojet participated in periodic discussions and negotiations with prospective purchasers regarding possible sale of the site. An Aerojet vice-president of corporate development served as the companies' designated individual for meetings with prospective purchasers.

In November 1979, one year after the incorporation of Cordova/Michigan, Aerojet prepared a prospectus for review by a West German company considering acquisition of the site.

After production activities at the site ceased in 1985, Aerojet participated in the continuing management of the site and leased portions of the site to third parties. Cordova/Michigan's manager of the Muskegon site reported directly to Aerojet officials working in an unincorporated division, Aerojet Investments. The manager's budget was approved by Aerojet.

### 4. Integration of business

Despite their separate corporate existence, Cordova/California and Cordova/Michigan operated as a single, integrated business entity. The subsidiaries performed functions that previously had been part of the operations of Aerojet's own Cordova division prior to the incorporation.

EI manufactured by Cordova/Michigan at the site was shipped to Cordova/California's main plant for use in the production of several drug intermediates. Receiving supplies of EI was critical to the success of Cordova/California, which was the largest user of the chemical in the United States.

Integration of the businesses of Cordova/California and Cordova/Michigan extended beyond the supplying of EI. Cordova/California handled marketing services for Cordova/Michigan, including solicitation of business and the processing of orders received. Cordova/Michigan did not even retain the paperwork regarding its customers' orders. In addition to providing marketing services for Cordova/Michigan, Cordova/California managed all payroll, management, and accounting matters for both companies. Cordova/Michigan periodically paid Cordova/California for these services.

Cordova/California also established the sales schedule for Cordova/Michigan, and Cordova/California participated in decisions regarding Cordova/Michigan's production quotas and inventory controls.

### 5. Board of directors

Following the separate incorporation of Cordova/California and Cordova/Michigan, the subsidiaries' board of directors were inactive and nearly non-existent. As a result, policy-making for the companies was primarily handled by Aerojet officials serving in the subsidiaries' management.

Cordova/California and Cordova/Michigan never actually held regular board of directors meetings. Benjamin Simmons, president of Cordova/California and Cordova/Michigan as well as a director of both corporations, could not recall ever attending a board of directors meeting or even that any such meeting was ever held.

The boards of Cordova/California and Cordova/Michigan were composed almost entirely of Aerojet employees, and the boards essentially functioned to consent to the policies established by management.

### 6. Management

Aerojet participated actively in and exerted control over day-to-day operations at Cordova/California and Cordova/Michigan through widespread representation within the management ranks of the subsidiaries. As a result, the managements of Cordova/California and Cordova/Michigan were separate from Aerojet in form, not substance.

Throughout the Cordova era, leading Aerojet corporate officers held identical or similar positions with the wholly owned subsidiaries. After the incorporation of Cordova/California and Cordova/Michigan, no major distinction among the management groups for the three companies existed.

Aerojet officials dominated the management of the Cordova subsidiaries. At least 20 different corporate officers simultaneously held identical or nearly identical positions with Aerojet, Cordova/California and Cordova/Michigan during the Cordova era. At least 25 officers held the same posts with Cordova/California and Cordova/Michigan at the same time.

The president of the three companies was the same individual on at least two occasions totalling more than four years. In addition, the president of Cordova/California and Cordova/Michigan was the same person on three occasions. Individuals who served simultaneously as officers with Aerojet, Cordova/California and Cordova/Michigan were paid by Aerojet. Other Cordova/Michigan officers were paid by Cordova/California.

Other individuals held the same or nearly identical posts in triplicate, serving simultaneously as vice president, treasurer, assistant treasurer, secretary, and assistant secretary of Aerojet, Cordova/California and Cordova/Michigan. In addition to these positions, Cordova/California and Cordova/Michigan shared officials serving as executive vice-president and controller.

This domination occurred from the inception of the separate corporate existence of Cordova/California. Immediately after Cordova/California's incorporation, a number of Cordova division officials merely as-

sumed identical titles and responsibilities with Cordova/California, including the president, vice-president for operations, controller, and vice-president for marketing. In short, Cordova/California was operated as it had when it was the unincorporated Cordova division; a change in form, not substance had occurred. Similarly, the separate incorporation of Cordova/Michigan merely resulted in a multiplicity of titles, not a change in the way operations functioned at the site.

Aerojet further exercised influence over the management of its subsidiaries by having top officers report directly to the parent company, rather than to the subsidiaries' board of directors. For example, Benjamin Simmons, president of Cordova/California from 1977 to 1979, reported to Aerojet president J.H. Volbrecht and senior vice-president Clay Matthews. Delores Dorsey, who served as treasurer of all three companies for nearly eight years, reported directly to Aerojet's vice-president of finance, not the directors or presidents of the subsidiaries.

Aerojet also exerted control over the management of its subsidiaries by handling personnel decisions. Aerojet officials interviewed applicants and selected replacements for vacancies within Cordova/California and Cordova/Michigan.

In sum, Aerojet actively participated in the management and direction of Cordova/California and Cordova/Michigan through representation within their management groups, which frequently mirrored the management of Aerojet itself. As a result of this widespread involvement in the management of its subsidiaries, Aerojet participated in and controlled decision-making in all facets of the company, including sales, marketing, manufacturing and waste disposal.

### 7. Financial matters

In addition to Aerojet's control over day-to-day operations at the subsidiaries through domination of management, Aerojet exercised total financial control over Cordova/California and Cordova/Michigan.

Cordova/California and Cordova/Michigan lacked authority to open a bank account, a power retained solely by Aerojet. All money generated by the subsidiaries was deposited into an Aerojet account. Cordova/California and Cordova/Michigan advised customers to send payments to a California post office box belonging to Aerojet.

In 1984, Aerojet assigned $25 million in worthless debt owed to it by Cordova/Michigan to Cordova/California, which eliminated more than $13 million owed by Aerojet to Cordova/California. The agreement assigning the debt was prepared by an Aerojet attorney and signed by Cordova/California's treasurer, who did not make any independent determination of whether the agreement was in the best interest of Cordova/California.

## III. CONCLUSIONS OF LAW

### A. CERCLA overview

■ CERCLA liability attaches if: 1) a release of hazardous substances has occurred, 2) at a facility, 3) causing a plaintiff to incur response costs, 4) and the defendant is a responsible party as defined under section 107(a), 42 U.S.C. § 9607(a). *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir.1989); *United States v. Aceto Agricultural Chemicals Corp.,* 872 F.2d 1373 (8th Cir.1989); *CPC Int'l Inc. v. Aerojet–General Corp.,* 731 F.Supp. 783, 786 (W.D.Mich.1989).

In this liability trial, the parties stipulated to the first three elements of liability, including that each party has incurred response costs in connection with the cleanup at the site. As a result, the central liability issue is whether CPC, MDNR, Aerojet, Cordova/California or Cordova/Michigan are responsible parties under section 107(a).

Section 107(a) establishes four bases for CERCLA liability. It provides:

Notwithstanding any other provisions or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a ... facility,

(2) any person who at the time of a disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable....

42 U.S.C. § 9607(a).

In this action, the parties have invoked the first three of these liability provisions in bringing their claims: liability under section 107(a)(1) as a present owner and operator; liability under section 107(a)(2) as a past owner and operator at a time of a disposal; and liability under section 107(a)(3) as an arranger for disposal. Because the parties have stipulated that each is a "person" as defined under CERCLA, the question of their respective liability turns solely on whether status as a present owner and operator, past owner or operator at a time of disposal or arranger for disposal applies.

█ In applying these liability provisions to the facts of this case, the court is mindful that CERCLA is a broadly remedial statute. Although some of CERCLA's provisions are vague and its legislative history sparse, the statute clearly aims to achieve prompt cleanup of hazardous waste sites by placing the ultimate financial responsibility for cleanup on those responsible for the pollution. *J.V. Peters & Co. v. Administrator*, 767 F.2d 263, 264 (6th Cir.1985); *Walls v. Waste Resource Corp.*, 761 F.2d 311, 318 (6th Cir.1985). As one court stated after examining the statute's legislative history, "Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1112 (D.Minn.1982).

In light of CERCLA's remedial goals, the court is obligated to construe the statute's liability provisions broadly to avoid frustrating its legislative purpose. *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1045 (2d Cir.1985); *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 192 (W.D.Mo.1985); *United States v. Mottolo*, 605 F.Supp. 898, 902 (D.N.H.1985). To the extent that liability under CERCLA is greater than under common law principles of tort and corporations, it is the result of CERCLA's statutory language and legislative intent, which the court is bound to follow unless and until it is altered by Congress.

*B. Conclusions of law regarding CPC liability*

1. Claims against CPC

The United States, MDNR and the Cordova defendants claim that CPC is liable under section 107(a)(2) as a past owner or operator of the site. The parties claim that CPC as a parent corporation is liable because of its involvement with its former wholly owned subsidiary, Ott II, which owned the site from 1965 to 1972. The parties also allege that CPC should be held liable because Ott II is the successor corporation of Ott I.

2. Section 107(a)(2) "operator" liability

*a. Parent corporation liability under section 107(a)(2)*

█ After studying the statute, prior case law[6] and the critical literature on the

---

**6.** A number of courts have recognized that parent corporations may be liable in CERCLA cases under limited circumstances as past owners or operators of sites contaminated by their subsidi-

subject[7], it is clear to the court that section 107(a)(2) liability may attach to a parent corporation in two ways. The first basis for liability of a parent corporation is direct liability under the "operator" language of CERCLA's section 107(a)(2). The second basis for liability is through common law veil-piercing, which may arise in any liability case involving a corporate defendant.

In determining that parent corporations may be held directly liable under CERCLA, the court relies on the language of the statute itself. Section 107(a)(2) of CERCLA holds liable "any person who at the time of disposal of any hazardous substances owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). The statute defines "owner or operator" circuitously to mean:

> ... (ii) in the case of an onshore facility ... any person owning or operating such facility, and (iii) in the case of any facility, title or control of which was conveyed due to bankruptcy, foreclosure, tax delinquency, abandonment, or similar means to a unit of State or local government, any person who owned, operated or otherwise controlled activities at such facility immediately beforehand. Such term does not include a person, who, without participating in the management of a ...

facility, holds indicia of ownership primarily to protect his security interest in the ... facility.

42 U.S.C. § 9601(20).

Though lacking in specificity, the plain language of CERCLA makes it unmistakably clear that direct liability may attach to parties other than the actual owners of hazardous waste facilities.[8] To hold that actual ownership is mandated by CERCLA's liability provisions, a court would have to disregard the express language that makes liable those persons who have owned *or operated* a contaminated facility. Thus, reading the statute to employ only traditional concepts of ownership and liability through veil-piercing would require a court to ignore not only the statute's broadly remedial intent, but also its explicit words.[9] As a result, CERCLA liability may attach to parent corporations that have acted in a manner that constitutes operation of a facility even though they have not actually owned the site.

■ Determining what kind of activity by a parent corporation creates liability as an operator under section 107(a)(2) is a more difficult question. CERCLA provides little guidance. By defining "owner or operator" circuitously, the statute fails to make explicit the what kind of "operator"

---

aries. *See, e.g., United States v. Kayser-Roth Corp.,* 724 F.Supp. 15 (D.R.I.1989), *aff'd,* 910 F.2d 24 (1st Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991); *Mobay Corp. v. Allied-Signal, Inc.,* 761 F.Supp. 345 (D.N.J.1991); *United States v. Nicolet, Inc.,* 712 F.Supp. 1193 (E.D.Pa.1989); *In re Acushnet River & New Bedford Harbor,* 675 F.Supp. 22 (D.Mass.1987); *Idaho v. Bunker Hill Co.,* 635 F.Supp. 665 (D.Idaho 1986); *Colorado v. Idarado Mining Co.,* 1987 WL 56460, 1987 U.S.Dist.Lexis 14254 (D.Colo.1987). *Contra Joslyn Corp. v. T.L. James & Co., Inc.,* 696 F.Supp. 222 (W.D.La.1988), *aff'd,* 893 F.2d 80 (5th Cir. 1990).

7. *See, e.g.,* Aronsky & Fuller, "Liability of Parent Corporations for Hazardous Substance Releases under CERCLA", 24 U.S.F.L.Rev. 421 (1990); Allen, "Refining the Scope of CERCLA's Corporate Veil-Piercing Remedy", 6 Stan.Envtl.L.J. 43 (1986-87); Note, "Liability of Parent Corporations for Hazardous Waste Cleanup and Damages", 99 Harv.L.Rev. 986 (1986).

8. Courts have held that a number of persons who may not have held legal title to a hazardous

waste facility may be liable for its cleanup. *See, e.g., Kayser Roth,* 910 F.2d at 27 (parent corporations); *United States v. Fleet Factors Corp.,* 901 F.2d 1550 (11th Cir.1990) (secured creditors); *United States v. South Carolina Recycling & Disposal, Inc.,* 653 F.Supp. 984 (D.S.C.1984), *aff'd in part, vacated in part,* 858 F.2d 160 (4th Cir. 1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989) (lessees); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1052 (2d Cir.1985) (corporate officers and shareholders).

9. In *Joslyn Manufacturing Co. v. T.L. James & Co., Inc.,* 893 F.2d 80, 83 (5th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991), the Fifth Circuit held that a parent corporation only may be held liable under CERCLA under veil-piercing principles when the corporate form has been used as a sham. To the extent that *Joslyn* appears to hold that actual ownership is necessary for liability to attach under section 107(a)(2), the court disregards the case as contrary to the statute's plain language and purpose.

it is intended to reach. As a result, different tests for liability have been developed by the courts. *Compare Kayser–Roth*, 910 F.2d at 27 (holding that to find parent corporations liable under CERCLA "at a minimum ... requires active involvement in the activities of the subsidiary"); *Mobay*, 761 F.Supp. at 353–54 (holding parent corporations may be liable if they participated in the management or exercised control over a corporate entity) *with Bunker Hill*, 635 F.Supp. at 672 (holding liability turns on three-part test based on whether the parent corporation had the capacity to control or prevent release of hazardous material); *Kelley v. Arco Indus. Corp.*, 723 F.Supp. 1214, 1220 (W.D.Mich.1989) (adopting a test of whether a corporate individual "could have prevented or significantly abated the release of hazardous substances").

After visiting this issue over several months through exhaustive briefing for summary judgment and trial, I have concluded that CERCLA broadens the potential for liability of parent corporations without discarding entirely the traditional concept of limited liability that is central to corporate law. By expressly including as liable parties those that have "operated" facilities, Congress unmistakably expanded the reach of CERCLA beyond the limited realm of those who have "owned" sites. But the statute and its legislative history do not suggest that CERCLA rejects entirely the crucial limits to liability that are inherent to corporate law.

Accordingly, it seems that CERCLA's "owned or operated" language forges a new, middle ground. It is a ground that at once accommodates the general principle of limited liability and the broader principle of liability attaching for operative activity. To permit these principles to coexist under CERCLA, the liability of a parent corporation cannot attach simply because a parent has had involvement with its subsidiary in a manner merely consistent with their investment relationship. Rather, a parent must have actually operated the business of its subsidiary.

In this court's view, then, a parent corporation is directly liable under section 107(a)(2) as an operator only when it has exerted power or influence over its subsidiary by actively participating in and exercising control over the subsidiary's business during a period of disposal of hazardous waste. A parent's actual participation in and control over a subsidiary's functions and decision-making creates "operator" liability under CERCLA; a parent's mere oversight of a subsidiary's business in a manner appropriate and consistent with the investment relationship between a parent and its wholly owned subsidiary does not.

■ Factors to consider in assessing whether a parent corporation operated its subsidiary include the parent's participation in the subsidiary's board of directors, management, day-to-day operations, and specific policy matters, including areas such as manufacturing, finances, personnel and waste disposal. In addition, determining the origin and business function of the subsidiary in the context of the parent corporation's business may be helpful in determining whether the parent has operated a wholly owned subsidiary. Other evidence may be less probative if it is simply indicative of the actions of a prudent investor, rather than an active operator, including monitoring of a subsidiary's financial performance, consolidation of corporate business matters such as accounting and legal work, and cooperation between the subsidiary and the parent in research. In the final analysis, each case must be decided on its own unique facts and circumstances.

In arriving at this standard for direct CERCLA liability of parent corporations, the court joins a majority of courts that have similarly concluded that CERCLA requires significant control and active participation by a parent corporation for liability to attach. *See, e.g., Kayser Roth*, 910 F.2d at 27; *Mobay*, 761 F.Supp. at 354; *Rockwell Int'l Corp. v. IU Int'l Corp.*, 702 F.Supp. 1384, 1390 (N.D.Ill.1988); *Colorado v. Idarado Mining Co.*, 1987 WL 56460, 1987 U.S.Dist.Lexis 14254 (D.Colo.1987);

*New York v. Exxon Corp.*, 112 B.R. 540, 547 (S.D.N.Y.1990).

 The second basis for CERCLA liability of parent corporations is indirect or vicarious liability through the traditional common-law theory of veil-piercing. When a subsidiary itself is liable under CERCLA, a parent corporation may be held liable under circumstances that make it appropriate to disregard their separate corporate existence. In the Sixth Circuit, when applying a common law principle such as the vicarious liability of parent corporations to the question of CERCLA liability, state law controls. *Anspec Co., Inc. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1248 (6th Cir.1991).

 Under Michigan law, piercing the corporate veil to reach a parent corporation or other investor is an equitable doctrine that is applied to prevent fraud, illegality or injustice. *See Schusterman v. Employment Security Comm.*, 336 Mich. 246, 57 N.W.2d 869 (1953); *Soloman v. Western Hills Dev. Co.*, 110 Mich.App. 257, 312 N.W.2d 428, 431 (1981). Separate corporate existence is disregarded only in limited circumstances, and each case considering whether to disregard the corporate entity turns on its own unique factual circumstances. *Lettinga v. Agristor Credit Corp.*, 686 F.2d 442, 446 (6th Cir.1982); *Ann Arbor v. University Cellar, Inc.*, 401 Mich. 279, 258 N.W.2d 1 (1977); *Brown Bros. Equip. Co. v. State*, 51 Mich.App. 448, 215 N.W.2d 591 (1974).

 A Michigan court may generally pierce the veil of a parent corporation after finding that the subsidiary has been a mere instrumentality of the parent, that the separateness between the corporations has been used to commit fraud or wrong, and that unjust loss or injury to the plaintiff has occurred. *Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 873 F.2d 109, 112 (6th Cir.1989); *Maki v. Copper Range Co.*, 121 Mich.App. 518, 328 N.W.2d 430 (1982).

 It also may be appropriate under some circumstances to pierce the veil of a separate corporate entity to serve the interests of justice when an individual is the sole shareholder of a corporation, as in the case of a parent corporation and its wholly owned subsidiary. *See Lettinga*, 686 F.2d at 446; *Pettaway v. McConaghy*, 367 Mich. 651, 116 N.W.2d 789, 790 (1962); *Montgomery v. Central Nat'l Bank & Trust Co.*, 267 Mich. 142, 255 N.W. 274, 276 (1934). For example, the fiction of the corporate form may be disregarded when a complete identity of interests exists between two corporate individuals so as to suggest that one was simply the alter ego of the other. *See Pettaway*, 116 N.W.2d at 790; *Williams v. American Title Ins. Co.*, 83 Mich.App. 686, 269 N.W.2d 481, 486 (1978); *Montgomery*, 255 N.W. at 276.

#### b. Liability of CPC under section 107(a)(2)

 To determine first whether CPC is directly liable under section 107(a)(2), the court has engaged in a highly fact-specific inquiry into the history of CPC's involvement with Ott II. In assessing CPC's level of participation and control in Ott II's activities, the court has evaluated various aspects of Ott II's business and its parent-subsidiary relationship, including: the role and composition of Ott II's board of directors; the role and composition of Ott II's management; the conduct of high-ranking CPC officials with respect to Ott II; the supervision of Ott II by CPC's development company; CPC's budgetary and capital expenditure restraints on Ott II; and CPC's involvement in specific Ott II policy matters, including waste disposal and labor problems.

After considering these and all the facts regarding CPC's involvement with Ott II, the court holds that CPC is directly liable under section 107(a)(2) as an operator because CPC actively participated in and exerted significant control over Ott II's business and decision-making. CPC's history of involvement in Ott II through its board, management, the CPC development company, and specific policy matters including hazardous waste disposal, demonstrates the high level of participation required for

direct liability to attach to CPC under section 107(a)(2).

The court has considered the following facts particularly probative: 1) CPC's 100-percent ownership of Ott II; 2) CPC's active participation in, and at times majority control over, Ott II's board of directors, which was an active decision-making body chaired by a CPC official throughout the Ott II era; 3) CPC's involvement in major decision-making and day-to-day operations through CPC officials who served within Ott II management, including the positions of president and chief executive officer; 4) the conduct of CPC officials with respect to Ott II affairs, particularly Arnold Ott, James Eiszner and Beverly Warner; 5) the function of the CPC development company as another source of policy-making for Ott II; 6) the active participation of and control by CPC officials in Ott II environmental matters, particularly through CPC's environmental director G.R.D. Williams who helped formulate Ott II policies, participated in regulatory meetings and issued directives regarding Ott II's responses to regulatory inquiries; 7) the active participation of CPC officials in Ott II labor problems; and 8) the financial control exerted by CPC through its approval of Ott II's budgets and major capital expenditures.

Liability attaches here because the evidence shows active participation and control by CPC in Ott II affairs both internally through the subsidiary's board and management and externally through the policies of the development company and the actions of individual CPC officials. The evidence shows a level of participation and control by CPC that exceeds the bounds of an interested investor and enters the realm of an active operator. When a parent corporation permeates the board, management and decision-making of a wholly owned subsidiary that was disposing of hazardous waste, operator liability directly attaches under CERCLA.

Based on all of these facts, the court holds CPC directly liable under section 107(a)(2) as an owner or operator during a period of disposal of hazardous waste.

Because the court has concluded that CPC is directly liable under CERCLA's section 107(a)(2), it need not reach the question of whether CPC should be held liable under CERCLA through common-law veil-piercing, which is an alternative theory of liability.

Similarly, CPC's direct CERCLA liability makes it unnecessary to reach at this juncture the parties' claim of CPC liability arising from Ott II allegedly have been a successor corporation to Ott I.

■■■ A successor corporation may be a liable person under CERCLA. *Anspec,* 922 F.2d at 1247–48. Successor liability is a theory that may be applied under limited circumstances to reach parties that otherwise might escape responsibility for cleanup costs. *See, e.g., Smith Land & Improv. Corp. v. Celotex Corp.,* 851 F.2d 86 (3d Cir.1988), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989); *Kelley v. Thomas Solvent Co.,* 725 F.Supp. 1446, 1457–59 (W.D.Mich.1988); *United States v. Vertac Chem. Corp.,* 671 F.Supp. 595, 614–19 (E.D.Ark.1987). In this case, however, CPC's direct liability for the cleanup costs at the site eliminates the necessity of determining the successorship question for liability purposes; based on its direct liability under section 107(a)(2), CPC is jointly and severally liable for cleanup costs at the site.

Nevertheless, the question of successor liability—namely, whether CPC may be held liable for the hazardous waste disposal of the Ott I era under Michigan successor liability and veil-piercing principles—could have some relevance to the court's future determination on the issue of apportionment. A responsible party's degree of involvement in the disposal of hazardous waste, the amount of hazardous waste involved and the degree of care exercised by the parties are some of the factors that a trial court may consider in determining the parties' proportionate shares in a contribution action. *United States v. R.W. Meyer, Inc.,* 932 F.2d 568 (6th Cir.1991). As a result, the court defers any conclusions with respect to successorship until it reach-

es allocation issues at the conclusion of the remedy phase of this case.[10]

### C. Conclusions of law regarding MDNR liability

#### 1. Claims against MDNR

CPC and the Cordova defendants claim that MDNR should be held liable under CERCLA for its activities at the site. CPC alleges that MDNR, Aerojet and Cordova/California are liable under section 107(a)(3) as arrangers of disposal arising from the October 1977 stipulation and consent order entered into by MDNR and Cordova/California. CPC, Aerojet, Cordova/California and Cordova/Michigan also allege that MDNR is liable under section 107(a)(2) as an operator due to its cleanup efforts at the site.

#### 2. Section 107(a)(3) "arranger" liability

As the court has previously discussed, CPC's section 107(a)(3) claim, though novel, is tenable under the broadly remedial provisions of CERCLA. *CPC Int'l Inc. v. Aerojet–General Corp.*, 759 F.Supp. 1269, 1277–81 (W.D.Mich.1991); *CPC Int'l Inc. v. Aerojet–General Corp.*, 731 F.Supp. 783, 789–90 (W.D.Mich.1989).

■■■ CPC has alleged that MDNR agreed at the time of Cordova/California's acquisition of the site, to remedy the groundwater contamination problem through resumed operation of purge wells. Because the purge wells were not operated and the groundwater contamination continued to spread, CPC claims, MDNR, Aerojet and Cordova/California should all be held liable for an arrangement for disposal of contaminated groundwater that actually worsened the problem.

In opinions ruling on pretrial motions, the court has recognized that the unchecked spread of groundwater contamination qualifies as disposal under CERCLA's statutory definition of the term. 42 U.S.C. § 9601(29) (adopting 42 U.S.C. § 6903(3)); *CPC*, 759 F.Supp. at 1278; *CPC*, 731 F.Supp. at 789. In addition, the court has noted that, if proved, CPC's allegations would make a case for CERCLA liability that is consistent with the statute's goal of placing the burden of cleanup on the parties responsible for creating or worsening an environmental problem. *CPC*, 759 F.Supp. at 1279–80. *See also United States v. Waste Indus. Inc.*, 734 F.2d 159, 164 (4th Cir.1984); *Emhart Indus., Inc. v. Duracell Int'l, Inc.*, 665 F.Supp. 549, 574 (M.D.Tenn.1987); *United States v. Price*, 523 F.Supp. 1055 (D.N.J.1981), *aff'd*, 688 F.2d 204 (3d Cir.1982).

Several factual disputes precluded summary judgment on CPC's arranger claim. *CPC*, 759 F.Supp. at 1278–81. The central question in dispute was whether an agreement actually existed between MDNR and Cordova/California for MDNR to remedy the groundwater contamination problem.

After hearing all the testimony and evidence, the court has found that no agreement existed among the parties with respect to the groundwater contamination problem. Instead, the fate of the contaminated groundwater was left unresolved by the parties. After MDNR and Cordova/California reached an agreement regarding other cleanup responsibilities at the site, MDNR attempted to address the groundwater problem as part of its ongoing regulatory activity over the severe environmental problems at the site. As a result, MDNR requested and obtained a

---

**10.** During trial, the court denied CPC's motion to exclude evidence regarding successor liability. Trial tr. at 2458–60. The court based its decision in part on the pretrial order that expressly set forth as an unresolved issue "whether Ott–II is the corporate successor to Ott–I" and facts relevant to the successor question. *Id.* After trial, CPC filed a motion to strike proposed findings of fact and conclusions of law filed by the United States and MDNR that asserted CPC, not Ott II, is the corporate successor to Ott I. CPC argues that it had no notice of this

alternative theory of liability. As noted above, the court has not reached successorship issues in concluding that CPC is liable under CERCLA section 107(a)(2). Therefore, CPC's motion is moot with respect to liability. Parties participating in the remedy phase of the trial may, with leave of the court, file additional findings of fact and conclusions of law on the successor corporation issue that may be relevant to the court's allocation decision. Accordingly, CPC's motion is denied without prejudice.

$170,000 appropriation for a new groundwater purging system.

Because no arrangement was made between MDNR and Cordova/California with respect to the groundwater contamination, MDNR, Aerojet and Cordova/California are not liable under section 107(a)(3) as arrangers for disposal.

■ Other facts also preclude imposition of liability against MDNR under section 107(a)(3). As the court has previously noted, for liability to attach to a party without actual ownership or possession of a facility, a nexus must exist in which a party has assumed responsibility for or control over the disposition of hazardous waste. *CPC*, 759 F.Supp. at 1278; *CPC*, 731 F.Supp. at 789–90. *See also United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 743 (8th Cir. 1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *Stilloe v. Almy Bros., Inc.*, 759 F.Supp. 95, 103–04 (N.D.N.Y.1991); *United States v. Mottolo*, 629 F.Supp. 56, 60 (D.N.H.1984).

In this case, a nexus of control or possession is lacking in the case against MDNR because MDNR's involvement in cleanup activities at the site was only regulatory. MDNR merely worked to eliminate or reduce severe environmental problems that had been left by prior owners and threatened public health and the environment. While dicta in the court's opinions on pretrial motions recognized the possibility of a sufficient nexus between MDNR and the site, MDNR proved at trial that a nexus of ownership or control between MDNR and the site did not exist.

■ Even if a prima facie section 107(a)(3) case against MDNR had been made, MDNR would not be liable because its actions at the site were taken in response to an environmental emergency. Section 107(d)(2) states, in relevant part:

No State ... shall be liable under this title for costs or damages as a result of actions taken in response to an emergency created by the release or threatened release of a hazardous substance generated by or from a facility owned by another person. This paragraph shall not preclude liability for costs or damages as a result of gross negligence or intentional misconduct by the State or local government. For the purpose of the preceding sentence, reckless, willful, or wanton misconduct shall constitute gross negligence.

42 U.S.C. § 9607(d)(2).

MDNR's regulatory activities at the site were initiated in response to an environmental emergency posed by dire environmental conditions that were created by prior owners and that threatened to worsen. Further, the state's response was devoid of the misconduct or gross negligence that would strip MDNR of its immunity under section 107(d)(2). Instead, the agency's cleanup efforts, though only a partial remedy for the problems, were a good-faith attempt to eliminate or control an environmental disaster at a time when the agency's tools were severely limited. The court concludes that section 107(d)(2) immunizes MDNR from any liability under section 107(a) because the state's activities at the site were an appropriate response to an environmental emergency.

3. Section 107(a)(2) "operator" liability

■ As the court has detailed above, "operator" liability must be interpreted broadly in accordance with the language and intent of CERCLA. A state may thus be held liable as an operator in limited circumstances when it permits hazardous waste disposal to occur at a site over which it exercises dominion or control. *See Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989); *CPC*, 731 F.Supp. at 787–89; *United States v. Stringfellow*, 31 Envtl.L.Rep. 1315 (C.D.1990); *Hassayampa Steering Comm. v. Arizona*, 21 Chem. Waste Lit.Rptr (BNA) 322 (D.Ariz.1990); *CPC*, 731 F.Supp. at 787–88. However, CERCLA liability does not arise when a state agency merely engages in regulatory activity at a site. *See United States v. Dart Indus. Inc.*, 847 F.2d 144, 146 (4th Cir.1988); *United States v. Azrael*, 765 F.Supp. 1239 (D.Md.1991); *CPC*, 731 F.Supp. at 788.

In this case, MDNR's regulatory response to severe environmental problems left by others does not constitute the possession or control necessary for a state to become an operator. Because MDNR's actions were regulatory and the agency did not assume possession or control over the site or its problems, the court concludes that MDNR cannot be held liable as an operator under section 107(a)(2).

Furthermore, as set forth above, section 107(d)(2) immunizes MDNR from any CERCLA liability because its efforts at the site were a response to an environmental emergency and its actions cannot be characterized as gross negligence or intentional misconduct. *See supra*, pp. 577–78.

For the reasons stated, MDNR is not liable as an operator under section 107(a)(2).

### D. Conclusions of law regarding liability of Aerojet, Cordova/California, Cordova/Michigan

1. Claims against Aerojet and its subsidiaries

The United States, MDNR and CPC have advanced a variety of claims against Aerojet and its wholly owned subsidiaries, Cordova/California and Cordova/Michigan. The United States, MDNR and CPC allege that Cordova/Michigan and Aerojet are liable under section 107(a)(1) as the present owner and operator of the site. They further allege that Aerojet, Cordova/California and Cordova/Michigan are liable under section 107(a)(2) for having owned or operated the site during a period of disposal. CPC also alleges that Aerojet and Cordova/California may be held liable under section 107(a)(3) for the alleged arrangement with MDNR for removal of contaminated groundwater.

2. Section 107(a)(1) "present owner" liability

Section 107(a)(1) holds the "present owner and operator of a ... facility" liable. Because it is undisputed that Cordova/Michigan has held legal title to the site since 1978, direct CERCLA liability clearly attaches to Cordova/Michigan under section 107(a)(1).

Aerojet's liability under section 107(a)(1) as a present owner turns on the question of whether piercing the corporate veil is appropriate. Aerojet cannot be held directly liable under section 107(a)(1) merely because its wholly owned subsidiary is the actual owner and operator of the facility. But as with section 107(a)(2) "owner or operator" liability, a parent corporation may be held liable as a "present owner and operator" if the circumstances justify disregarding the corporate form and attaching vicarious liability.

As noted above, the Sixth Circuit recently established that state law controls questions of when CERCLA liability should attach to parent corporations under common law theories and principles. *Anspec*, 922 F.2d at 1248. In this case, then, Michigan's veil-piercing standards apply. Under Michigan law, the court therefore must engage in a searching inquiry into all the unique facts and circumstances of the parent-subsidiary relationship at issue to determine whether their separate corporate existences should be disregarded. *See supra*, at p. 574.

After considering all the evidence as well as controlling Michigan law on veil-piercing, the court concludes that this is an appropriate case to disregard the corporate form to serve the interests of justice. *See Lettinga*, 686 F.2d at 446; *Pettaway*, 116 N.W.2d at 790; *Montgomery*, 255 N.W. at 276.

Aerojet totally dominated Cordova/Michigan, creating a complete identity of interests between the parent and its wholly owned subsidiary. In both its corporate structure and function, Cordova/Michigan was a mere instrumentality of Aerojet, lacking any structural or actual independence in the operation of its business. The creation of Cordova/Michigan as a separate subsidiary only served as an attempt to shield Aerojet from liabilities associated with the companies' integrated business at a facility where pollution problems were known to exist. Permitting Aerojet to escape CERCLA liability as the present own-

er and operator here would create an injustice to the parties who are entitled to recover their cleanup costs from the present owner and operator of a contaminated site. It would also do injustice to CERCLA itself, which aims to make parties that have actually owned or operated hazardous waste sites pay for their cleanup.

For these reasons, the court concludes that Aerojet is liable under section 107(a)(1) because, under Michigan's well-settled standards, veil-piercing is appropriate. *See Bodenhamer Bldg. Corp.*, 873 F.2d at 112; *Lettinga,* 686 F.2d at 446; *Pettaway,* 116 N.W.2d at 790; *Montgomery,* 255 N.W. at 276.

In reaching this conclusion, the court has considered the following facts to be particularly probative: 1) Aerojet was 100–percent shareholder of Cordova/California, which in turn wholly owned Cordova/Michigan; 2) Aerojet itself led the acquisition of the site, only incorporating its Cordova division after it became apparent that the site would be purchased, about 10 days before the signing of the stipulation and consent order; 3) the timing of the incorporation of Cordova subsidiaries reflected Aerojet's singular goal of insulating itself from liability; 4) the purpose of acquiring the site was to manufacture a product essential to Aerojet's Cordova division that would no longer be available from outside sources; 5) when manufacturing operations commenced at the site, Cordova/Michigan was part of an integrated business operation in which Cordova/Michigan supplied EI for use in manufacturing by Cordova/California; 6) the incorporation of Cordova/Michigan and Cordova/California were changes in form, not in substance, as former officers in Aerojet's Cordova division retained identical or similar jobs with the new subsidiaries; 7) Aerojet dominated the corporate hierarchy of both Cordova/Michigan and Cordova/California, where at least 20 Aerojet officials have held positions nearly identical to those they have held simultaneously with the parent company; 8) Cordova/Michigan and Cordova/California officials reported directly to Aerojet officials, who held authority to give directions on day-to-day operations and policy matters; 9) the board of directors of Cordova/Michigan and Cordova/Michigan were non-functional and did not even convene in meetings; 10) Aerojet possessed total financial control over Cordova/Michigan and Cordova/California, which lacked of authority to maintain separate bank accounts; and 11) Aerojet arranged the assignment to Cordova/California of $25 million in worthless debt owed to it by Cordova/Michigan, which effectively eliminated $13 million owed by Aerojet to Cordova/California.

For the reasons stated, the court holds Cordova/Michigan and Aerojet liable under section 107(a)(1) as the present owner of the site.

3. Section 107(a)(2) "operator" liability

 Because disposal of hazardous substances occurred at the site during the Cordova era [11], the liability of Cordova/California and Aerojet turns on whether the companies have "owned or operated" the facility, as with the court's determination of CPC's liability.

Cordova/California actually owned the site until it transferred the property to its newly created subsidiary, Cordova/Michigan, in November 1978. During this period, Cordova/California engaged in construction activities to prepare the facility for its chemical manufacturing operations, and the company engaged in the cleanup activities set forth in the stipulation and consent order signed with MDNR. Because Cordova/California owned the site from October 1977 to November 1978 during which hazardous waste disposal occurred, the court holds Cordova/California liable under section 107(a)(2).

---

**11.** As the court has noted above and in its previous opinions, disposal of hazardous substances at the site occurred after 1977, as contaminants continued to spread into the ground and water and were carried off-site by the flow of groundwater. *See, supra,* p. 576; *CPC,* 759 F.Supp. at 1278; *CPC,* 731 F.Supp. at 789. In addition, hazardous substances used at the site during the Cordova period of ownership has been found in the contamination at the site, indicating that additional disposal occurred.

Aerojet's liability under section 107(a)(2) must be determined under the same framework used in CPC's case, in which direct liability under the statute's "operator" language and vicarious liability through common law veil-piercing provide alternative theories for holding a parent corporation liable. *See supra*, pp. 571–74.

In assessing Aerojet's direct liability as an operator at the site, the court must once again engage in a comprehensive inquiry into Aerojet's relationship with its subsidiaries and involvement with the site during the Cordova era. The court must determine whether the evidence has shown that Aerojet exerted power or influence by actively participating in and exercising control over the subsidiaries' business during a period of disposal of hazardous waste.

In light of the same facts that were probative in concluding Aerojet is liable under section 107(a)(1), the court concludes that Aerojet operated the site through active participation and pervasive control over the businesses of both Cordova/California and Cordova/Michigan.

As with CPC's involvement with Ott II, Aerojet's participation and control over the board, management and decision-making at Cordova/California and Cordova/Michigan shows that the parent operated the facility. Aerojet's conduct toward its subsidiaries extended well beyond the activities that are merely indicative of a parent's general oversight of a wholly owned subsidiary.

Accordingly, the court concludes the Aerojet is directly liable as an operator under section 107(a)(2).

Aerojet's direct liability under section 107(a)(2) makes it unnecessary to pierce the corporate veil under this provision, although the court has already concluded that disregarding the corporate form is appropriate in Aerojet's case for liability under section 107(a)(1). *See supra*, pp. 578–79.

For the reasons set forth above, Cordova/California and Aerojet are liable under section 107(a)(2).

#### 4. Section 107(a)(3) "arranger" liability

As the court addressed above in concluding that MDNR could not be held liable as an arranger, no agreement existed between MDNR and either Aerojet or Cordova/California with respect to a remedy for the groundwater contamination that existed at the site at the time of the signing of the stipulation and consent order. *See, supra* at pp. 576–77.

Accordingly, the court concludes that Aerojet and Cordova/California are not liable under section 107(a)(3) for arranging for the disposal of hazardous waste.

#### 5. Section 107(b)(3) innocent landowner defense

■ Aerojet, Cordova/California and Cordova/Michigan contend that any liability findings against them are precluded by section 107(b)(3). The section provides a limited defense to CERCLA's strict liability to those parties who are innocent purchasers. The provision states, in relevant part:

There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—

. . . .

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substances, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; ...

42 U.S.C. § 9607(b)(3). The statute further defines "contractual relationship," whose

existence can prevent use of the innocent purchaser defense, to include, without limitation:

land contracts, deeds or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence:

(i) At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility.

. . . . . .

42 U.S.C. § 9601(35)(A).

To summarize, section 107(b)(3) provides a defense to liability in this case if a defendant shows that: 1) the hazardous contamination at the site was caused solely by other parties; 2) no direct or indirect contractual relationship existed between it and the parties responsible for contaminating the site; 3) it did not know or have reason to know of the contamination at the site at the time of purchase; and 4) it exercised due care with respect to the hazardous waste at the site.

■ Failure to prove any of these elements by a preponderance of the evidence precludes use of the innocent landowner defense. Aerojet, Cordova/California and Cordova/Michigan so fail. By acquiring the site from Story's bankruptcy trustee, Cordova/California had an indirect contractual relationship with a party responsible for contaminating the site. *See In re Sterling Steel Treating, Inc.*, 94 B.R. 924 (Bkrtcy.E.D.Mich.1989). In addition, Aerojet and Cordova/California clearly knew about contamination at the site; in fact, Aerojet's obligations for cleanup were central to the negotiations over acquisition of the site. Aerojet and its subsidiaries also have failed to prove that the contamination

was caused solely by others and that they exercised due care at the site. A hazardous substance used by Cordova/Michigan in its manufacturing process is among those in the contamination at the site. In addition, the contamination created by prior owners has spread unabated off site, worsening the contamination problem, due at least in the part to the continued inoperation of purge wells. These facts make the defense of section 107(b)(3) inapplicable to the liability of Aerojet, Cordova/California and Cordova/Michigan.

For these reasons, the court holds that section 107(b)(3) does not preclude the imposition of liability against Cordova/Michigan, Cordova/California and Aerojet.

## IV. CONCLUSION

Based on the findings of facts and conclusions of law set forth above, the court holds that CPC, Aerojet, Cordova/California and Cordova/Michigan are liable under CERCLA's section 107(a) for cleanup costs at the site, and that MDNR is not liable.

CPC is liable for claims brought under section 107(a)(2) as an operator of the site during a period of disposal.

MDNR is not liable for claims brought under section 107(a)(2) as an operator of the site during disposal or under section 107(a)(3) as an arranger for disposal of hazardous waste.

Aerojet is liable for claims brought under section 107(a)(1) as the present owner and operator of the site and under section 107(a)(2) as an operator of the site during disposal. Cordova/California is liable under section 107(a)(2) as an operator of the site during disposal. Cordova/Michigan is liable under section 107(a)(1) as the present owner and operator of the site and under section 107(a)(2) as an owner or operator during a period of disposal. Aerojet and Cordova/California are not liable under section 107(a)(3) as arrangers of disposal of hazardous waste.